

United States District Court
Southern District of Texas
FILED

JAN 0 3 2008

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MID-CONTINENT CASUALTY COMPANY | § | **H 08 -21** |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-07-_____ |
| ACADEMY DEVELOPMENT, INC., | § | |
| CHELSEA HARBOUR, LTD., LEGEND | § | |
| CLASSIC HOMES, LTD., and LEGEND | § | |
| HOME CORPORATION | § | |

## MID-CONTINENT CASUALTY COMPANY'S
## ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Mid-Continent Casualty Company ("Mid-Continent") comes before this Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 et seq., seeking declaratory relief regarding the rights, status and legal relationship between Mid-Continent and its insureds, Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation (collectively "Legend").

Mid-Continent seeks a declaration that it owes no duty to defend or indemnify Legend under any of five separate commercial general liability (CGL) policies collectively covering the period from August 1, 2000 to August 1, 2005, against any of the causes of action and factual allegations in Cause No. 05-CV-142846; *Linda Budiman et al. v. Academy Development, Inc. et al.*; in the 268th Judicial District Court of Fort Bend County, Texas (the "Budiman Lawsuit").[1]

Mid-Continent seeks a declaratory judgment that any duty to defend or indemnify for the losses being asserted in the Budiman lawsuit are precluded by the known loss or fortuity doctrine because the insureds knew or should have known that the losses made the basis of the claims in

---

[1]   A true and correct copy of Linda Budiman et al.'s Eighth Amended Petition is attached as **Exhibit A**.

the *Budiman* suit had commenced prior to the date that the policies in question were obtained by the insureds.

In the alternative, to the extent a duty to defend and/or indemnify exists, Mid-Continent seeks a declaratory judgment that such duty exists only under Policy No. 04-GL-000557144, with an effective date of August 1, 2004 to August 1, 2005.

In the alternative, to the extent a duty to defend and/or indemnify is determined to exist under multiple policies, Mid-Continent seeks a declaratory judgment as to which claims fall under which policy so that a determination can be made as to the applicable deductible that should be applied to the various claims in the underlying suit.

Further, in the alternative, to the extent a duty to defend and/or indemnify exists, Mid-Continent also seeks a declaratory judgment that it has the right under its policies to appoint defense counsel to represent the insureds in the Budiman lawsuit.

Finally, in the alternative, to the extent a duty to defend and/or indemnify exists, Mid-Continent also seeks a declaratory judgment that, any out-of-pocket cost incurred by Legend as a result of their decision to retain defense counsel of their own choosing, does not apply to the policy deductible.

## I. PARTIES

1.      Plaintiff, Mid-Continent Casualty Company, is an insurance company incorporated under the laws of the State of Oklahoma, with its principal place of business in Tulsa, Oklahoma. Mid-Continent is therefore a citizen and resident of Oklahoma.

2.      Defendant, Legend Classic Homes, Ltd. is a Texas limited partnership, with its principal place of business in Houston, Texas.  A limited partnership takes on the citizenship of all its members for purposes of diversity of citizenship.  Legend Classic Homes, Ltd. is a citizen and resident

of Texas.  The sole general partner of Legend Classic Homes, Ltd. is Legend Home Corporation, a Texas corporation.  The limited partners of Legend Classic Homes, Ltd. are unknown, as that information is not publicly available.  Because the sole general partner of Legend Classic Homes, Ltd. is a Texas corporation and therefore a citizen and resident of Texas, Legend Classic Homes, Ltd. is a citizen and resident of the State of Texas.  Legend Classic Homes, Ltd. may be served by serving its registered agent, Lauren Darby, 10410 Windermere Lakes Boulevard, Houston, Texas 77065, or anywhere she may be found.

* * * Service is requested at this time. * * *

3.      Defendant, Academy Development, Inc. is a Texas corporation, with its principal place of business in Houston, Texas.  Academy Development, Inc. is therefore a citizen and resident of the State of Texas.  Academy Development, Inc. may be served by serving its registered agent, Lauren Darby, 10410 Windermere Lakes Boulevard, Houston, Texas 77065, or anywhere she may be found.

* * * Service is requested at this time. * * *

4.      Defendant, Chelsea Harbour, Ltd. is a Texas limited partnership, with its principal place of business in Houston, Texas.  The sole general partner of Chelsea Harbour, Ltd. is Camcorp Management, Inc., which is a Texas corporation.  The limited partners of Chelsea Harbour, Ltd. are unknown, as that information is not publicly available.  Because the sole general partner of Chelsea Harbour, Ltd is Camcorp Management, Inc., which is a citizen and resident of Texas, Chelsea Harbour, Ltd is therefore a resident and citizen of the State of Texas.  Chelsea Harbour, Ltd may be served by serving its registered agent, Lauren Darby, 10410 Windermere Lakes Boulevard, Houston, Texas 77065, or anywhere she may be found.

* * * Service is requested at this time. * * *

3

5.      Defendant, Legend Home Corporation is a Texas corporation, with its principal place of business in Houston, Texas.  Legend Home Corporation is a citizen and resident of the State of Texas, and may be served by serving its registered agent, Lauren Darby, 10410 Windermere Lakes Boulevard, Houston, Texas 77065, or wherever she may be found.

* * * Service is requested at this time. * * *

## II. JURISDICTION AND VENUE

6.      The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 2201.  Mid-Continent is a citizen of the State of Oklahoma.  Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation are each citizens of the State of Texas.  An actual controversy exists between the parties.  Specifically, Legend has sought defense and indemnity under the CGL policies issued by Mid-Continent as a result of the claims made in the Budiman Lawsuit.  Although Mid-Continent has provided a defense to Legend under a reservation of rights, Mid-Continent owes Legend no defense and indemnity under the facts set forth in Plaintiffs' Eighth Amended Petition in the Budiman Lawsuit.  The amount in controversy exceeds $75,000, exclusive of interests and costs, as required by 28 U.S.C. § 1332(a).[2]

7.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because Houston, Texas is the district in which all Defendants reside.  Venue is also proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial portion of the events giving rise to this action occurred in Houston, Texas.  In particular, the CGL policies made the basis of this lawsuit were issued to Legend in Houston, Texas.  Legend's claim for defense and indemnity under the CGL policies occurred in Houston,

---

[2]   At Paragraph 13 of **Exhibit A**, Plaintiffs seek "actual compensatory damages in the amount of Two Hundred Thousand ($200,000.00) per household."  Plaintiffs further list 31 separate households, for a total of $6,200,000.00.

Texas, as did Mid-Continent's provision of a defense subject to a reservation of rights.  Finally, venue is also proper pursuant to U.S.C. § 1391(a)(3) because Legend is subject to personal jurisdiction in Houston, Texas at the time of the filing of this lawsuit.

### III. FACTS

8.      On May 23, 2005, Linda Budiman and 124 other plaintiffs (collectively "Budiman Lawsuit Plaintiffs") sued Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., Chelsea Harbour Homeowner's Association, and Legend Home Corporation in the 268th Judicial District Court of Fort Bend County, Texas, generally alleging their acts and omissions had resulted in damage to homes purchased by the Budiman Lawsuit Plaintiffs in the Chelsea Harbour Subdivision.[3]  The Budiman Lawsuit Plaintiffs assert three causes of action against Legend: (1) statutory fraud; (2) negligence and negligent misrepresentation; and (3) violations of the Texas Deceptive Trade Practices Act.

9.      The Budiman Lawsuit Plaintiffs allege Legend marketed homes in the Chelsea Harbour Subdivision as "water-front" and/or "lake-front estates" in order to induce buyers such as the Budiman Lawsuit Plaintiffs to purchase homes there, despite being aware of "defects and problems" with the lakes.[4]  Specifically, the Budiman Lawsuit Plaintiffs allege that, at the time they sold homes to the public, Legend knew the walls of the lakes in the Chelsea Harbour Subdivision were breaking apart and that water was leaking from the lakes into the adjacent properties where Budiman Lawsuit Plaintiffs' homes were located, but failed to "adequately and properly" disclose this fact to the Budiman Lawsuit Plaintiffs.[5]

---

[3]     Mid-Continent does not insure Chelsea Harbour Homeowner's Association.

[4]     **Exhibit A** at page 8.

[5]     *Id.* at pages 9-11.

10.     The Budiman Lawsuit Plaintiffs allege that, prior to purchasing their homes in Chelsea Harbour Subdivision, Legend required one or more of them to sign a disclosure statement, which was "inadequate and contained misrepresentations and statements that were misleading, deceptive, and false."[6]  In addition, the Budiman Lawsuit Plaintiffs allege that, in some cases, they asked direct questions of Legend but, with the exception of the foregoing disclosure, "did not receive adequate information that would warn or otherwise notify them" of the lake problems.[7]

11.     The Budiman Lawsuit Plaintiffs allege that, subsequent to purchasing their homes in Chelsea Harbour Subdivision, Legend "made misrepresentations and false, misleading, and deceptive acts or statements to [Budiman Lawsuit Plaintiffs] concerning [Legend's] knowledge of the condition and problems of the [l]akes, the need and status of repairs, the nature and extent of the [l]ake problems, the purpose of the repairs, the nature of any guarantee or warranty, the status of any investigation, the length of repairs, [Legend's] legal obligations, [the Budiman Lawsuit Plaintiffs'] legal rights, and various other issues concerning the [l]akes."[8]

12.     The Budiman Lawsuit Plaintiffs allege that Legend "failed to follow their own experts' advice and attempted to repair the [l]akes without the necessary and proper plans and specifications," and that "these attempted repairs were inadequate and did not meet acceptable industry and engineering standards."[9]

13.     According to the Budiman Lawsuit Plaintiffs:  "continuous and excessive water leakage from the [l]akes that flow [sic] laterally and under [Budiman Lawsuit Plaintiffs'] homes and

---

[6]     *Id.* at page 11.

[7]     *Id.* at page 12.

[8]     *Id.*

[9]     *Id.* at page 13.

properties may cause structural damage to [Budiman Lawsuit Plaintiffs'] homes and foundations. Over time, this will cause [Budiman Lawsuit Plaintiffs] to incur excessive repair costs to the foundations and structures of their homes."[10]

14.   The Budiman Lawsuit Plaintiffs allege that Legend "[was] engaged in a civil conspiracy in that [Legend] had common knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to [the Budiman Lawsuit Plaintiffs]" and that Legend "conspired to withhold information from [the Budiman Lawsuit Plaintiffs] that should have been disclosed prior to [the Budiman Lawsuit Plaintiff's] purchase of their homes and subsequently misled [the Budiman Lawsuit Plaintiffs] regarding the condition of the [l]akes."

15.   Notwithstanding the various particular acts and omissions alleged to have been committed by Legend with the sole exception of the damage to their homes allegedly caused by an improper lake repair, the Budiman Lawsuit Plaintiffs sue for economic damages allegedly resulting from the diminished value of their homes.  Specifically, the Budiman Lawsuit Plaintiffs summarize at Paragraph 33 of their Eighth Amended Petition:

> Similarly, [Budiman Lawsuit Plaintiffs] contend in this lawsuit that the failure of the Lakes directly affects the value of the homes in the community.  [Budiman Lawsuit Plaintiffs] will demonstrate that the impact of the failed Lakes, the extended construction process, and the necessity and cost of future repairs will have a negative impact on the home values in the Chelsea Harbour subdivision. [Budiman Lawsuit Plaintiffs] will also be required to disclose these Lake issues to future buyers which will further reduce the market values of [Budiman Lawsuit Plaintiffs'] homes.  As such, [Budiman Lawsuit Plaintiffs'] homes and properties have suffered diminution of value due to the past, present, and future condition of the Lakes.

---

[10]   *Id.* at page 14.  Although the Underlying Lawsuit Plaintiffs express their property damage claims throughout the lawsuit in both conditional ("may cause") and future ("will cause") terms, at Paragraph 34 of **Exhibit A**, they finally make a single statement in which they allege present property damage:  "Plaintiffs' homes *are* experiencing an unreasonable amount of drywall cracks, joint separations in trim and windows, tiles breaking, mortar cracks, and windows cracking without impact (emphasis added).

## IV. THE POLICIES

16.     Mid-Continent insured Legend Classic Homes, Ltd., Academy Development, Inc.,

Chelsea Harbour, Ltd., and Legend Home Corporation under five separate CGL policies with

effective dates ranging from August 1, 2000 to August 1, 2005, summarized as follows:

| Policy Number | Effective Date |
| --- | --- |
| 04-GL-000037547 | August 1, 2000 to August 1, 2001 |
| 04-GL-000060196 | August 1, 2001 to August 1, 2002 |
| 04-GL-000088658 | August 1, 2002 to August 1, 2003 |
| 04-GL-000123869 | August 1, 2003 to August 1, 2004 |
| 04-GL-000557144 | August 1, 2004 to August 1, 2005 |

Each of the foregoing CGL policies was issued in the name of Legend Classic Homes, Ltd. d/b/a

Princeton Classic Homes but, via endorsement, listed Academy Development, Inc., Chelsea Harbour,

Ltd., and Legend Home Corporation as additional named insureds.

17.     Each policy contains a standard Commercial General Liability Coverage Form,

which sets forth the terms of the basic insuring agreement between Mid-Continent and Legend.[11]   In

particular, Mid-Continent and Legend agreed in pertinent part that it would "pay those sums that the

insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this

insurance applies."[12]   It was further agreed that "[t]his insurance applies to 'bodily injury' and

'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by and

'occurrence' that takes place . . . during the policy period."[13]

18.     At Section V of the Commercial General Liability Coverage Form, "property

damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of

---

[11]   Policies 04-GL-000037547 and 04-GL-000060196 contain an earlier version of the Commercial General Liability
Coverage Form found in the three other policies; however, their terms do not differ in any material respect.

[12]   Commercial General Liability Coverage Form (CG0001 10/01) at Section I.1.a.

[13]   *Id.* at Section I.1.b.1, 2.

that property . . . or [l]oss of use if tangible property that is not physically injured."[14]  "Occurrence" is

defined as "an accident, including continuous or repeated exposure to substantially the same general

harmful conditions." [15]

19.   In addition, the basic coverage otherwise afforded by the Commercial General

Liability Coverage Form is limited and/or modified by the following:

**2.   Exclusions**

This insurance does not apply to:

**a.   Expected Or Intended Injury**

"Bodily Injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**j.   Damage to Property**

"Property damage" to:

(1)   Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(5)   That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

---

[14]   *Id.* at Section V.17.

[15]   *Id.* at Section V.13.

(6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**k.    Damage To Your Product**
"Property damage" to "your product" arising out of it or any part of it.

**l.    Damage To Your Work**
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**m.    Damage To Impaired Property Or Property Not Physically Injured**
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:
(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract of agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

20.    The policies also contain the following endorsement which changes some of the exclusions cited above:

\*\*\*

THIS ENDORSEMENT CHANGES THE POOLICY.  PLEASE READ IT CAREFULLY
RESIDENTIAL CONTRACTOR EXTENSION A
HOMEBUILDERS DIVISION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Exclusion j. of COVERAGE A (SECTION I)** is hereby replaced by the following:

This insurance does not apply to:
**j.**    "Property damage" to:
(1)    Property you own, rent or occupy:

(2)     Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises.  This exclusion does not apply if the premises are "your work" and were not occupied, rented or held for rental by you for more than a period of 12 consecutive months immediately after completion of the premises;

(3)     Property loaned to you, but this exclusion does not apply to liability assumed under a sidetrack agreement;

(4)     Personal property in your care, custody or control, but this exclusion does not apply to liability assumed under a sidetrack agreement;

(5)     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arise out of those operations.  This exclusion does not apply to liability assumed under a sidetrack agreement; or

(6)     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.  This exclusion does not apply to liability assumed under a sidetrack agreement or to "property damage" included in the "products-completed operations hazard."

All other conditions remain unchanged.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

21.    The policies contain the following endorsements which set out the applicable policy deductible for the various policy years.  Because the various policies have different deductibles, a determination of the year that the claim or claims accrued is extremely important in determining the duties and obligations of the parties to the contract of insurance, including both the duty to defend and the duty of indemnification.

\*\*\*

POLICY NUMBER:  04-GL-000088658  (Policy period- 8/01/02 to 8/01/03) contains the

following endorsement pertaining to the deductible under the policy:

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

DEDUCTIBLE LIABILIYT INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

| Coverage | Amount and Basis of Deductible | |
| --- | --- | --- |
| | PER CLAIM or | PER OCCURRENCE |
| Bodily Injury Liability | $ | $ |
| Property Damage Liability | $ 5,000. | $ |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement.  If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

A.  Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

B.  You may select a deductible amount on either a per claim or a per "occurrence" basis.  Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above.  The deductible amount stated in the Schedule above applies as follows:

    1.      PER CLAIM BASIS.  If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

        a.      Under Bodily Injury Liability Coverage, to all damages and **allocated loss expense** sustained by any one person because of "bodily injury"';

        b.      Under Property Damage Liability Coverage, to all damages and **allocated loss expenses** sustained by any one person because of "property damage"; or

        c.      Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined to all damages and **allocated**
                (1)      damage"; or
                (2)      "bodily injury" and "property damage" combined
                as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

C.      The terms of this insurance, including those with respect to:

     1.      Our right and duty to defend the insured against any "suits" seeking those damages; and
     2.      Your duties in the event of an "occurrence", claim, or "suit"
     apply irrespective of the application of the deductible amount.

D.      We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**ADDITIONAL DEFINITION:**

     **Allocated loss Expenses** means expenses incurred by the company in defense of settlement of claims.

Policy No. 04-GL-000123869 (Policy period 8/01/03 to 8/01/04) contains the same endorsement listing a $50,000 deductible for bodily injury liability and/or property damage liability combined. This is not tied to any per claim or per occurrence basis and therefore would appear to be a straight $50,000 deductible for all claims that arose during the policy period.

Policy No. 04-GL-000557144 (Policy period 8/01/04 to 8/01/05) made only one significant change to the previous policies and that was to raise the deductible provided in the above endorsement for bodily injury and/or property damage liability combined to $100,000 per claim.

## V. DECLARATORY RELIEF

22.     As an interested party under the policies, whose rights are affected by the insuring agreement(s) contained therein, Mid-Continent seeks the following declaration of its rights thereunder.

**A.      There Is No Coverage for Losses That the Insureds Knew or Should Have Known Had Begun Prior to the Date that the Mid-Continent Policies Were Issued.**

23.     The policies do not provide coverage for and the common law precludes an insured from obtaining insurance coverage for a loss that the insured knew or should have known had commenced prior to the date that policy was issued. In the present case, it is believed that the Legend knew about the losses or events that form the basis of some, if not all, of the claims

being asserted against them in the underlying suit. In Paragraph 19 of the Plaintiff's Eighth Amended Petition in the underlying suit against Legend, it is alleged that Legend and the other parties to that suit filed suit against the entities responsible for constructing the lakes in the development and that the suit was filed in 2002. In the suit filed against Legend, it is alleged that the lakes were leaking due to improper construction. Based on the foregoing, it is believed that Legend had knowledge of the loss as early as 2002 which would be prior to the issuance of at least three of the Mid-Continent policies and may have had knowledge of the loss as much as two years before that which could be before the issuance of all of the Mid-Continent policies. Legend is therefore precluded from seeking coverage under the Mid-Continent policies for some or all of those claims in the underlying suit, and Mid-Continent hereby seeks a determination of when Legend either knew or should have known about the losses and events in question.

**B.      A Declaration That There Is No Duty To Defend Under The Policies Because The Only Allegation Of "Property Damage" Made By Budiman Lawsuit Plaintiffs Is Excluded Under The Policies.**

24.      When determining an insurer's duty to defend its insured, Texas courts follow the "eight corners rule."[16]  Under this rule, the court must look only at the pleadings and the insurance policy to determine whether the duty to defend exists.[17]  The court may not consider the truth or falsity of the allegations in the underlying pleadings.[18]  Similarly, in determining the applicability of provisions of the policy, the court must focus on the facts that show the origin of the damages, not the legal theories asserted for recovery.[19]  If a petition against an insured

---

[16]   *Cullen/Frost Bank of Dallas, N.A. v. Commonwealth Lloyd's Insurance Co.*, 852 S.W.2d 252, 255 (Tex. App.—Dallas 1993, writ denied).

[17]   *Cluett v. Medical Protective Co.*, 829 S.W.2d 822, 829 (Tex.App.-Dallas 1992, writ denied)

[18]   *Argonaut Southwest Insurance Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973).

[19]   *Continental Casualty Co. v. Hall*, 761 S.W.2d 54, 56 (Tex. App.—Houston [14th Dist.] 1988, writ denied), cert. denied, 495 U.S. 932 (1990).

alleges only facts that are not covered by the policy, the insurer is not required to defend.[20]

25.    In their Eighth Amended Petition, the Budiman Lawsuit Plaintiffs make numerous factual allegations against Legend purporting to support their three asserted causes of action; however, with the exception of the Budiman Lawsuit Plaintiffs' allegation of negligence in repairing the lakes, all of the asserted facts and causes of action allegedly result <u>only in economic damages</u> (i.e. the diminution in value of the Budiman Lawsuit Plaintiffs' homes).  In Texas, economic damages are not property damages as defined by liability insurance policies.[21] Moreover, even if some economic damages <u>could</u> fall within the definition of property damage, "courts uniformly hold that those resulting from misrepresentations do not."[22]

26.    The only factual allegation that could conceivably constitute "property damage" within the meaning of the policies is as follows:

> In the Academy lawsuit, [Legend's] own experts had detailed the problems with the Lakes and the necessary repairs and estimated costs of repair.  However, to the extent that such proposed Lake repairs were adequate, [Legend] failed to follow their own experts' advice and attempted to repair the Lakes without the necessary and proper plans and specifications.  Upon information and belief, these attempted repairs were inadequate and did not meet acceptable industry and engineering standards.  Upon information and belief, these repairs will fail over time and the Lakes will experience excessive water loss.[23]

---

[20]    *Fidelity & Guaranty Insurance Underwriters v. McManus*, 633 S.W.2d 787, 788 (Tex. 1982).

[21]    *State Farm Lloyds v. Kessler*, 932 S.W.2d 732, 737 (Tex. App.—Fort Worth 1996, writ denied) (citing *Houston Petroleum Co. v. Highlands Insurance Co.*, 830 S.W.2d 153, 156 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *Terra International, Inc. v. Commonwealth Lloyd's Insurance Co.*, 829 S.W.2d 270, 273 (Tex. App.—Dallas 1992, writ denied); *Lay v. Aetna Insurance Co.*, 599 S.W.2d 684, 686-87 (Tex. App.—Austin 1980, writ ref'd n.r.e.)).

[22]    *Id.* citing *State Farm Fire & Casualty Co. v. Brewer*, 914 F.Supp. 140, 142-43 (S.D.Miss.1996) (holding that termite damage does not fall within the meaning of property damage in the policy because the alleged misrepresentations did not cause the damage; the termites did); *Allstate Ins. Co. v. Morgan*, 806 F.Supp. 1460, 1464 (N.D.Cal.1992) (holding that claims alleging negligent misrepresentation and failure to disclose seek economic damages, not property damages within insured's policy); *Qualman v. Bruckmoser*, 471 N.W.2d 282, 285 (1991) (holding that pecuniary damages are not property damages under insured's policy).

[23]    **Exhibit A** at Paragraph 30.

\* \* \*

> Upon information and belief, continuous and excessive water leakage from the Lakes that flow [sic] laterally and under the [Budiman Lawsuit Plaintiffs'] homes and properties may cause structural damage to [Budiman Lawsuit Plaintiffs'] homes and foundations.[24]

Although the Budiman Lawsuit Plaintiffs allege facts which could constitute "property damage"—albeit _future_ damage—under the policies, such "property damage" is nonetheless excluded pursuant to the terms of the Commercial General Liability Coverage Form as it is the result of an intentional act on the part of Legend.[25]

27.    According to the Texas Supreme Court:  "The determination of whether an insured's faulty workmanship was intended or accidental is dependent on the facts and circumstances of the particular case."[26] The Budiman Lawsuit Plaintiffs' description of the facts underlying their claim for negligence makes clear that Legend' alleged failure to adequately repair the lakes in the Chelsea Harbour Subdivision was the result of a volitional act.[27]  Under Texas law, when an insured's acts are voluntary and intentional, the results or injuries, even if unexpected, are not caused by an "accident," and therefore the event is not an "occurrence" under the policy.[28]

---

[24]   _Id._ at Paragraph 32.

[25]   Mid-Continent does not assert that the Underlying Lawsuit Plaintiffs have failed to allege "property damage" occurring within the policy period despite continued references to conditional and future damages ("may" and "will") because, at Paragraph 34 of their Eighth Amended Petition, the Underlying Lawsuit Plaintiffs finally allege their "homes are experiencing an unreasonable amount of drywall cracks, joint separations in trim and windows, tiles breaking, mortar cracks, and windows cracking without impact."

[26]   _Lamar Homes, Inc. v. Mid-Continent Casualty Company_, 2007 WL 2459193 at 5 (Tex. 2007).

[27]   _See Continental Casualty Co. v. Hall_, 761 S.W.2d 54, 56 (Tex. App.—Houston [14th Dist.] 1988, writ denied), cert. denied, 495 U.S. 932 (1990) (In determining the applicability of provisions of the policy, the court must focus on the facts that show the origin of the damages, not the legal theories asserted for recovery.)

[28]   _Argonaut Southwest Insurance Co. v. Maupin_, 500 S.W.2d 633, 635 (Tex.1973); _Misle v. State Farm Mutual Automobile Insurance Co._, 908 S.W.2d 289, 291 (Tex. App.—Austin 1995, no writ); _Decorative Center of Houston v. Employers Casualty Co._, 833 S.W.2d 257, 262 (Tex. App.—Corpus Christi 1992, writ denied); _Baldwin v. Aetna Casualty & Surety Co._, 750 S.W.2d 919, 921 (Tex App.—Amarillo 1988, writ denied).

Specifically, the Budiman Lawsuit Plaintiffs allege that: (1) Legend's own experts had detailed the problems with the Lakes and the necessary repairs and estimated costs of repair; (2) Legend decided not to follow their own experts' advice and attempted to repair the Lakes without the necessary and proper plans and specifications. In other words, the Budiman Lawsuit Plaintiffs allege that Legend was informed and aware of the proper method for effecting the required repairs to the lakes, but nonetheless proceeded in disregard of this information.

28.    Viewed another way, the Texas Supreme Court has held that "if [an] act is deliberately taken, performed negligently, and the effect is not the intended or expected result had the deliberate act been performed non-negligently, there is an accident."[29]  However, an effect is "intended or expected" if, from the viewpoint of the insured, the injury could have been reasonably anticipated or foreseen.[30]  It cannot be seriously argued that Legend, <u>having first been advised by their own experts as to the nature and extent of the problem, as well as the proper procedure for repairing the lakes,</u> could not have reasonably foreseen that choosing <u>not</u> to follow this advice might cause the lakes to continuing leaking into the surrounding soil, possibly causing uneven settling of the foundations of nearby homes.[31]  In particular, the Budiman Lawsuit Plaintiffs allege at Paragraph 19 of their Eighth Amended Petition:

> At the time that [Legend] sold homes to the public, [they] knew that the Lakes were failing. In particular, Defendants knew that the walls of the Lakes were breaking apart and that water was leaking from the Lakes into the adjacent properties upon which [the Budiman Lawsuit Plaintiffs'] homes were located.

---

[29]    *Mid-Century Insurance Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999).

[30]    *See Republic National Life Insurance Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex.1976).

[31]    *See CoTemp, Inc. v. Houston West Corp.*, 222 S.W.3d 487, 491 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (To be foreseeable, the plaintiff's injuries must be of such a general character they might have been reasonably anticipated, but the defendant need not anticipate the particular accident or injury that actually occurred.)

From the Budiman Lawsuit Plaintiffs' own factual allegations, it is evident Legend was aware of the consequences of failing to follow the advice and direction of its own experts in effecting a repair of the lakes.

29. Given the specific facts alleged in their Eighth Amended Petition, the Budiman Lawsuit Plaintiffs' complaint of "negligence" involves Legend's failure to choose a specific course of repair (i.e. one consistent with the advice of their own experts), and not the method by which such course of repair was performed (i.e. one whose result could not reasonably be anticipated by Legend). As such, the Budiman Lawsuit Plaintiffs' allegations do not describe an accident, and therefore an "occurrence," within the meaning of the policies.

**C.   Alternatively, In The Event There Is A Duty To Defend, A Declaration That Mid-Continent Has The Duty To Defend Only Under Policy No. 04-GL-000557144.**

30. As more fully set forth in Section V (A) above, the Budiman Lawsuit Plaintiffs allege only one set of facts that could potentially have resulted in "property damage" under the policies. Specifically, that "[Legend] failed to follow its own experts' advice and attempted to repair the Lakes without the necessary and proper plans and specifications."[32] At Paragraph 30 of their Eighth Amended Petition, the Budiman Lawsuit Plaintiffs allege:

> "Documents obtained by Plaintiffs indicate that Academy and Chelsea Harbour received at least $2 million dollars in settlement proceeds from the Harris County lawsuit. These funds were ostensibly to be used by [Legend] to make repairs to the Lakes.

Because the Budiman Lawsuit Plaintiffs explicitly make reference to the settlement of the "Harris County lawsuit" in identifying the timeframe during which Legend allegedly failed to properly repair the lakes, but do not explicitly disclose the date of such settlement, it is necessary to examine

---

[32] **Exhibit A** at Paragraph 30.

the First Amended Answer, Counterclaim, and Motion for Sanctions filed by Legend in the Budiman Lawsuit:

> On August 30, 2004, mediation was conducted, and a confidential settlement was reached. After Academy received the settlement proceeds a few weeks later, Academy began using the proceeds to repair the lakes using a new contractor.[33]

Furthermore, according to the Agreed Take Nothing Judgment filed in the "Harris County lawsuit" to which the Budiman Lawsuit Plaintiffs refer in their Eighth Amended Petition, the "Harris County lawsuit" was dismissed following settlement on November 17, 2004.

31.     The "eight-corners" rule prohibiting consideration of extrinsic evidence applies only to determining whether a duty to defend exists. Mid-Continent, arguing here in the alternative, merely seeks a determination by this Court—in the event such duty does exist—of the appropriate policy under which such defense must be provided. Evidence pinpointing the date of an event referenced in the Budiman Lawsuit Plaintiffs' Eighth Amended Petition for this purpose is therefore neither a determination of the existence of a duty to defend nor, strictly-speaking, extrinsic, since the event itself is referenced in the petition.

32.     Regardless, Texas courts have recognized a limited exception to the proscription against extrinsic evidence embodied in the "eight-corners" rule where such evidence is relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim.[34] To the extent the Court considers the identification of the specific policy under

---

[33] See Defendants' First Answer, Counterclaim, and Motion for Sanctions at Section A, page 2, attached as **Exhibit B**.

[34] See, e.g., W. Heritage Insurance Co. v. River Entertainment, 998 F.2d 311, 313 (5th Cir.1993) ("However, when the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue."); Westport Insurance Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P., 267 F.Supp.2d 601, 621-22 (E.D. Tex. 2003) (extrinsic evidence admissible in deciding the duty to defend where fundamental policy coverage questions can be resolved by readily determined facts that do not engage the truth or falsity of the allegations in the underlying petition, or overlap with the merits of the underlying suit); State Farm Fire & Casualty Co. v. Wade, 827 S.W.2d 448, 452-53 (Tex. App.—Corpus Christi 1992, writ denied) (concluding that extrinsic evidence could be admitted in

which a defense must potentially be provided inextricably intertwined with the determination of the existence of the duty itself, and to the extent the Court further believes the use of the Budiman Lawsuit Plaintiffs' own pleadings merely to date an event explicitly referenced in their Eighth Amended Petition is extrinsic in nature, such information is relevant to an <u>independent and discrete coverage issue</u>, not touching on the merits of the underlying claim, and therefore should be permitted as an exception to the "eight-corners" rule.

33.     The Deductible Liability Insurance Endorsement (Form ML 1241 – 12/01) of Policy No. 04-GL-000557144 provides for a $100,000.00 deductible per occurrence of "Bodily Injury Liability and/or Property Damage Liability Combined" as follows:

> 2.     **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:
>
> \* \* \*
>
> c.     Under Bodily Injury Liability and/or Property Damage Liability Combined to all damages and **allocated loss expenses** because of:
>
> > (1)     "Bodily injury";
> >
> > (2)     "Property damage"; or
> >
> > (3)     "Bodily injury" and "property damage" combined
>
> as the result of any one "occurrence," regardless of the number of persons or organizations who sustain damages because of that "occurrence."
>
> \* \* \*

---

deciding the duty to defend when the facts alleged are insufficient to determine coverage and "when doing so does not question the truth or falsity of any facts alleged in the underlying petition"); *Gonzales v. American States Insurance Co.*, 628 S.W.2d 184, 187 (Tex. App.—Corpus Christi 1982, no writ) (holding that facts extrinsic to the petition relating only to coverage, not liability, may be considered to determine a duty to defend, where such evidence does not contradict any allegation in the petition); *Cook v. Ohio Casualty Insurance Co.*, 418 S.W.2d 712, 715-16 (Tex. Civ. App.—Texarkana 1967, no writ) ("[T]he Supreme Court draws a distinction between cases in which the merit of the claim is the issue and those where the coverage of the insurance policy is in question. In the first instance the allegation of the petition controls, and in the second the known or ascertainable facts are to be allowed to prevail."); *International Service Insurance Co. v. Boll*, 392 S.W.2d 158, 161 (Tex. Civ. App.—Houston 1965, writ ref'd n.r.e.) (considering extrinsic evidence of identity of driver of insured vehicle by stipulation to conclude no duty to defend or indemnify arose).

**ADDITIONAL DEFINITION:**

Allocated Loss Expenses means expenses incurred by the company in defense or settlement of claims.

34.    Given the foregoing facts, it is clear that the only policy issued by Mid-Continent to Legend during which any property damage could potentially have occurred is Policy No. 04-GL-000557144, with an effective date of August 1, 2004 to August 1, 2005.  As such, Mid-Continent seeks a declaration from this Court that, in the event there is a duty to defend, such duty arises only under Policy No. 04-GL-000557144, subject to the $100,000 per occurrence deductible.

**D.    A Declaration That There Is No Coverage for Losses Excluded by the Business Risk Exclusions of the Policies.**

35.    Exclusions j through m found in the policies are commonly referred to as the business risk exclusions.  These exclusions preclude coverage under the policies for damage to the insured's work being performed on property if that damage arises as a result of the improper performance of that work.  Mid-Continent would show that to the extent that the development of the lakes and the construction of the homes are considered to be one project, any damage to the homes of the individual homeowners that is alleged to have resulted from the improper construction of the lake or the improper repairs to the lakes would be potentially subject to the business risk exclusions found in the policies.

E.    **Alternatively, In The Event There Is A Duty To Defend, A Declaration That Mid-Continent Has The Right Under The Policies To Choose Defense Counsel On Behalf Of Legend.**

36.    The Texas Supreme Court has held that "[w]hether an insurer has the right to conduct its insured's defense is a matter of contract."[35]  Further, the right to conduct the defense includes the authority to select the attorney who will defend the claim or suit.[36]  The Commercial General Liability Coverage Form provides in pertinent part:

> We will have the right and duty to defend the insured against any "suit" seeking [damages for "bodily injury" or "property damage"].  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.[37]

This language is substantively similar to the provision interpreted in *Davalos*, which provided that the insurer would "settle or defend, as we consider appropriate, any claim or suit asking for [bodily injury or property] damages."[38]

37.    The Texas Supreme Court has also cautioned that "[u]nder certain circumstances, however, an insurer may not insist upon its contractual right to control the defense."[39]  Specifically, the Texas Supreme Court has noted that "[i]n the typical coverage dispute, an insurer will issue a reservation of rights letter, which creates a potential conflict of interest."[40]  This potential conflict may become an actual conflict "when the facts to be adjudicated in the liability lawsuit

---

[35]   *Northern County Mutual Insurance Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex. 2003).

[36]   *Id.*

[37]   **Exhibit A** at Section 1.a.

[38]   *See Northern County Mutual Insurance Co. v. Davalos*, supra at 688.

[39]   *Id.*

[40]   *Id.* citing Allan D. Windt, Insurance Claims and Disputes, § 4.20 at 369 (4th ed. 2001).

are the same facts upon which coverage depends."[41]

38.     Given the facts in the Budiman Lawsuit, the potential for such a conflict does not exist.  As more fully set forth in Section V (A) above, a majority of the various facts asserted by the Budiman Lawsuit Plaintiffs in their Eighth Amended Petition pertain to Legend's alleged failure(s) to disclose, affirmative misrepresentations, other deceptive acts, and civil conspiracy, all of which allegedly resulted in economic damage to the Budiman Lawsuit Plaintiffs.  Because, as a matter of law, "economic damage" does not constitute "property damage" under any of the policies, there is no coverage.  As such, any liability facts to be adjudicated in this regard cannot be the same facts on which coverage depends. The remaining facts asserted by the Budiman Lawsuit Plaintiffs in their Eighth Amended Petition pertain to Legend' alleged failure to properly repair the lake.  In this regard, liability will turn, not on what the facts are—since none of the material facts are in dispute—but on the legal effect of such facts.

39.     More particularly, with regard to the Budiman Lawsuit Plaintiffs' negligence allegation, the facts that involve coverage turn on whether Legend's actions in repairing the lake were intentional, and therefore excluded.  There is no dispute between the Budiman Lawsuit Plaintiffs and Legend that the lake repairs were deliberately undertaken by Legend as an intentional act.   While there is disagreement as to whether the specific choice of repairs undertaken by Legend was adequate given the condition of the lakes, there is no dispute that the act of repairing the lakes itself was volitional and was not negligently performed.   In other words, there was nothing "accidental" in Legend' decision to repair the lake in the manner in which they did.  As a result, none of the remaining liability facts to be determined will affect the existence of coverage, however they are resolved.

---

[41]   *Id.* at 689.

40.     For example, in their Eighth Amended Petition, the Budiman Lawsuit Plaintiffs allege Legend attempted to repair the lakes without the "necessary and proper plans and specifications":

> However, to the extent that such proposed Lake repairs were adequate, [Legend] failed to follow their own experts' advice and attempted to repair the Lakes without the necessary and proper plans and specifications.  Upon information and belief, these attempted repairs were inadequate and did not meet acceptable industry and engineering standards.  Upon information and belief, these repairs will fail over time and the Lakes will experience excessive water loss.[42]

In their First Amended Answer, Counterclaim, and Motion for Sanctions, Legend responds that such plans and specifications were not necessary:

> In response to the questions about lake "repair plans," Mr. A.J. Schubach (the Addicks' project manager) explained that there were not any specific drawings or repair plans, and that his firm was simply installing the clay liner as it should have been done according to the original plans and specifications.[43]

Despite the fact there exists a factual dispute over whether specific drawings and/or repair plans were necessary for repair of the lakes, this is not relevant to the issue of coverage:  Whether or not such drawings and/or plans were or were not required goes to the question of adherence to, or violation of, the applicable standard of care (i.e., liability), not whether or not Legend's decision to repair the lakes without such drawings and/or plans was deliberate or accidental (i.e., covered).

41.     Similarly, there is also a dispute regarding whether or not the repairs attempted by Legend caused damage to the foundations of the Budiman Lawsuit Plaintiffs' homes; however, it does not affect the existence of coverage to the Insureds' detriment.  For example, the Budiman Lawsuit Plaintiffs allege:

---

[42]   **Exhibit A** at Paragraph 30.

[43]   **Exhibit B** at page 10.

> Upon information and belief, continuous and excessive water leakage from the Lakes that flow [sic] laterally and under the [Budiman Lawsuit Plaintiffs'] homes and properties may cause structural damage to [Budiman Lawsuit Plaintiffs'] homes and foundations.[44]

While Legend contends as follows in their First Amended Answer, Counterclaim, and Motion for Sanctions:

> Finally, Mr. Fred Ehteshami of Geotech also addressed concerns that were raised regarding foundations of the houses.   Mr. Ehteshami explained that, in his professional opinion, any water that had seeped underground would not cause damage to the homeowners' foundations.[45]

No matter which way this particular factual dispute is resolved, it will not adversely affect Legend to the benefit of Mid-Continent, thereby creating a conflict situation:  If it is proved the water leakage <u>has not</u> proximately caused foundation damage as alleged, Legend would not be liable;  if it is proved that the water leakage <u>has</u> proximately caused foundation damage, such an event (unless excluded by other facts) would constitute "property damage" under the policies.

42.    Because an insurer's right to defend is a matter of contract and, because such right to defend also includes the right to choose defense counsel, in the event there is a duty to defend, Mid-Continent seeks a declaration that it is entitled to choose defense counsel for Legend, as there is no conflict of interest created by a situation in which the facts to be adjudicated in the liability lawsuit are the same facts upon which coverage depends.

**F.   Alternatively, In The Event There Is A Duty To Defend, Legend May Not Apply The Out-Of-Pocket Cost To Retain Their Own Counsel To The Applicable Deductible.**

43.    Mid-Continent seeks a declaration that any amounts paid by Legend toward the cost of their chosen attorneys is not applicable to the deductible of any policy under which Mid-Continent may owe Legend a defense.

---

[44]   **Exhibit A** at Paragraph 32.

[45]   **Exhibit B** at page 10.

44.     By letter dated January 12, 2007 (attached as **Exhibit D**), Mid-Continent confirmed an understanding with its Insureds of the need for two separate defense attorneys in the Budiman Lawsuit:  one to represent the insured homebuilder entities, and one to represent the insured developer entities.  In order that Legend might continue to be represented by its counsel of record in the Budiman Lawsuit, Mid-Continent agreed to pay the costs of defense, subject to a reservation of rights, while Legend agreed to pay any difference in the hourly fee for both counsel over $150 per hour.

45.     As set out in detail in Section V (B) above, The Deductible Liability Insurance Endorsement (Form ML 1241 – 12/01) of Policy No. 04-GL-000557144 provides, in part, that the policy deductible is to be applied to all damages and allocated loss expenses because of bodily injury, property damage, or bodily injury and property damage combined, as the result of any one occurrence.  The term "allocated loss expenses," as defined by the Deductible Liability Endorsement, means expenses incurred by Mid-Continent in defense or settlement of claims.

46.     By its own express terms, the Deductible Liability Insurance Endorsement makes no mention—and thus no provision—for the application of any expenses incurred by Legend in the defense of claims to the deductible.  Nor can the term "damages" be reasonably interpreted to include any out-of-pocket costs incurred by Legend in retaining counsel of their choice.  In part, this is because the policy makes a distinction between "damages" and expenses incurred in defense or settlement of claims; clearly if these two concepts were synonymous, there would be no need for the distinction.  In part, this is also because "terms that are not defined in a policy are given their generally accepted or commonly understood meaning."[46]   Black's Law Dictionary defines "damages" as '[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or

---

[46]    *Lamar Homes, Inc. v. Mid-Continent Casualty Company, supra* at 3.

injury."[47]  In the present context, the Budiman Lawsuit Plaintiffs are the parties seeking damages, not Legend.[48]  Thus, even if "damages" included defense costs—which it does not—it would still not include the defense costs of Legend.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Mid-Continent Casualty Company requests that Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation be cited to appear and answer, and that on final trial, Mid-Continent Casualty Company receive the following:

1.)  A declaration that Mid-Continent Casualty Company does not owe Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation, a defense under any of the five separate CGL policies with effective dates ranging from August 1, 2000 to August 1, 2005, for the claims in the Budiman Lawsuit because such claims either do not constitute property damage or are otherwise excluded as intentional acts under the policies;

2.)  A declaration that Mid-Continent Casualty Company does not owe Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation, a defense or indemnity under any of the five separate CGL policies with effective dates ranging from August 1, 2000 to August 1, 2005, for the claims in the Budiman Lawsuit because such claims are excluded under the business risk exclusions in the policies;

3.)  A declaration that Mid-Continent Casualty Company does not owe Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation, a defense under any of the five separate CGL policies with effective dates ranging from August 1, 2000 to August 1, 2005, for the claims in the Budiman Lawsuit because such claims are subject to the provision in the insuring agreement that the insured is not to be provided coverage for losses that the insured knows to have commenced prior to inception of the policy and are also subject to the know loss or fortuity doctrine which precludes an insured from obtaining insurance coverage for a loss that the insured knew or should have known had commenced prior to the date that the policy was issued;

---

[47]  Black's Law Dictionary (8th ed.) at 416.

[48]  It is also logically true that any out-of-pocket costs incurred by Legend in order to retain their choice of counsel is money paid in *pursuit* of such compensation for loss or injury, not loss or injury in and of itself.

4.)     In the alternative, a declaration that Mid-Continent Casualty Company owes Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation, defense, indemnity or coverage only under policy no. 04-GL-000557144, with a $100,000 per occurrence deductible for bodily injury liability and/or property damage combined;

5.)     In the alternative, a declaration that Mid-Continent Casualty Company has a right under the five separate CGL policies with effective dates ranging from August 1, 2000 to August 1, 2005, to chose defense counsel on behalf of Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation; and

6.)     In the alternative, a declaration that any out-of-pocket cost incurred by Legend Classic Homes, Ltd., Academy Development, Inc., Chelsea Harbour, Ltd., and Legend Home Corporation in connection with the retention of defense counsel of their choosing, is not applicable to the deductible for any of the five separate CGL policies with effective dates ranging from August 1, 2000 to August 1, 2005;

7.)     And, that the court award to Mid-Continent Casualty Company its costs of court and such other and further relief as Mid-Continent Casualty Company may show itself to be entitled to.

Respectfully submitted,

**Martin, Disiere, Jefferson & Wisdom, L.L.P.**

Christopher W. Martin
Texas State Bar No. 13057620
Federal I.D. 13515
808 Travis, Suite 1800
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

ATTORNEY-IN-CHARGE FOR PLAINTIFF,
MID-CONTINENT CASUALTY COMPANY

OF COUNSEL:
Robert G. Dees
Texas State Bar No. 05716430
Federal I.D. 13899
Todd Lonergan
Texas State Bar No. 12513700
Federak I.D. 7769
Christopher K. Harshbarger
Texas State Bar No. 24032400
Federal I.D. 35332
808 Travis, Suite 1800
Houston, Texas  77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

5760-0011
00260778

29

Exhibit A

CAUSE NO. 05-CV-142846

| | | |
|---|---|---|
| LINDA BUDIMAN, MOHAMMED | § | IN THE DISTRICT COURT |
| MEMMON, EARNEST WILLIAMSON, | § | |
| AMIN MAREDIA, EHAB ASHOOR, | § | |
| MING LAI, NIZRA ALI, STEVE | § | |
| TEGTHOFF, SHIRISH DESAI, | § | |
| JONATHEN GRADY, REX SLATEN, | § | |
| ARN SINGH, DANIEL TURNER, | § | |
| MARVELYN HUMPHREY, ABASS ALI | § | |
| PLAINTIFFS | § | |
| | § | |
| VS. | § | 268TH JUDICIAL DISTRICT |
| | § | |
| ACADEMY DEVELOPMENT, INC., | § | |
| CHELSEA HARBOUR LTD. and, | § | |
| CHELSEA HARBOUR HOMEOWNER'S | § | |
| ASSOCIATION, INC. | § | |
| DEFENDANTS | § | FORT BEND COUNTY, TEXAS |

PLAINTIFFS' EIGHT AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Linda & Bennie Budiman, Mohammed & Shahida Memon, Earnest& Angela Williamson, Amin & Zulekha Maredia, Ehab & Nargis Ashoor, Ming & Yili Lai, Nizar & Zulekha Ali, Seema Aggarwal, Steve & Manette Tegtehoff, Shirish & Prabha Desai, Jonathan & Deimry Grady, Rex & Cecilia Slaten, Arun & Kalpana Singh, Daniel & Tracee Turner, Marvelyn Humphrey, Abbass & Mehnaz Ali, Emily & Michael Agina, Leslie & Alzaada Aikens, Sima Ajani & Amir Zulfikar, Shamsuddin & Dohra Ali, Jignesh & Niketa Amin, Sam & Angela Lee Chan, Paras & Jharna Chokshi, Paul Choudhuri, Mona Emmanuel, Frederick & Brenda Hoyer, Asif & Shireen Karim, Naushad & Narmin Kermally, Shahnaz & Mohammad Khanani, Ayub & Bilquis Khatri, Shafeeq & Rubina Khimani, Atkins & Louisa Lai, Hafiz & Amina Lakhani, Iqbal & Khatoon Lakhani, Alexander & Wen-Hsien Lin, Dinaz & Mohammad Lokhandwalla,

Rahim & Mehnaz Maknojia, Leelamma & M.G. Mathew, Manohar & Maharani Medi,

Joaquin & Maria de Lourdes Medina, Marsha Hart & Jonathan Mehta, Gerald Mischon,

Karim & Mumdaz Momin, Nizar & Dilshad Momin, Krishna & Kalyani Muppavarapu,

Anil & Sujata Nair, Khanh & Vivienne Nguyen, Raju & Amee Patel, Vijay & Sweety

Patel, Victor & Claudia Pena, Son & Phuong Pham, John & Nancy Phan, Amir & Roya

Rezvani, Terrence & Deborah Rolls, John & Wanda Rushing, Donald & Charyl Russell,

Nadir & Surraiyd Waliyani, Deborah & Charles Schmidt, Khushnood & Fauziya

Shokrekhuda, Yogesh Singal & Soni Gupta, Mammazhiyil & Saramma Thomas, Bernabe

& Elizabeth Tolosa, Hong & Quan Tran, Minhas & Farzana Vellani, Zhiguo Wang, and

Doug & Nicole White, Plaintiffs herein, and files this Plaintiffs' Amended Petition and

Request for Declaratory Relief against Academy Development, Inc. (hereafter called

"Academy"), Chelsea Harbour, Ltd.(hereafter called "Chelsea Harbour"), Chelsea

Harbour Homeowner's Association, Inc. (hereafter called "CHHOA"), Legend Classic

Homes, Ltd. and Legend Home Corporation (hereafter called "Legend"), and Princeton

Classic Homes, (hereafter called "Princeton"), Defendants herein, and in support thereof,

would show as follows:

### I. DISCOVERY CONTROL PLAN:
### LEVEL THREE (3)

1.      The Court has entered a Level Three (3) discovery plan as set forth in

T.R.C.P. 190.

### II. PARTIES AND SERVICE

2.      Plaintiffs are all individuals and past and present homeowners in the

Chelsea Harbour Subdivision located in Fort Bend County, Texas.

3.      Defendant Academy Development, Inc. (hereafter called "Academy") has

*Plaintiffs' Eight Amended Petition*   2

answered and appeared in this Cause.

4.      Defendant Chelsea Harbour, Ltd., (hereafter called Chelsea Harbour) has answered and appeared in this Cause.

5.      Defendant Chelsea Harbour Homeowner's Association, Inc., (hereafter called CHHOA) has answered and appeared in this Cause.

6.      Defendant Legend Classic Homes, Ltd (hereafter called "Legend") is a domestic Limited Partnership. This Defendant has appeared and answered this suit.

7.      Defendant Legend Home Corporation (hereafter called "Legend") is a domestic Corporation and the general partner of Defendant Legend Classic Homes, Ltd. This Defendant has appeared and answered this suit. For the purposes of this Petition, Legend Home Corporation and Legend Classic Homes, Ltd. will hereafter be collectively called "Legend". Legend operates under the assumed name Princeton Classic Homes (hereafter called "Princeton")

8.      All actions of Academy complained of herein were on behalf of Chelsea Harbour and any reference to Academy includes a reference to Chelsea Harbour. Chelsea Harbour is run by the General Partner, Campcorp Management, Inc.  Campcorp's president is Michael Wilkinson.  Academy Development is run by Michael Wilkinson and Legend Homes is run by Michael Wilkinson. Lauren Darby is the registered agent for Academy, Legend, Campcorp and Chelsea Harbour. The registered address of CHHOA is the same as the registered address for Campcorp.

9.      At all relevant times, the relationships between Academy, Chelsea Harbour, Legend, Princeton and the CHHOA were inextricably intertwined and Plaintiffs therefore cannot identify with specificity which identity made each false, deceptive, or

misleading statement, act, or misrepresentation.   Moreover, these Defendants had representatives that at various times identified themselves as agents or representatives of the aforementioned Defendants.   In this regard, Plaintiffs plead the doctrines of civil conspiracy and joint enterprises as set forth below.

### III.  JURISDICTION AND VENUE

10.   The subject matter and amount in controversy is within the jurisdictional limits of this court.

11.   This Court has jurisdiction over all of the Defendants because the events giving rise to this Cause substantially occurred in Fort Bend County, Texas. Further, the subject matter of this suit involves real property located in Fort Bend County.

12.   Venue is proper in Fort Bend County, Texas because the suit involves real property located in Fort Bend County, Texas.

### IV.  BREAKDOWN OF PLAINTIFFS

13.   The following Plaintiffs purchased homes from Legend/Princeton and shall be hereafter called "Legend Plaintiffs" and have claims against all Defendants in this case.   These Plaintiffs each seek actual compensatory damages in the amount of Two Hundred Thousand ($200,000.00) per household.   In addition, these Plaintiffs seek reasonable and necessary attorney's fees, exemplary damages, and all other relief requested below.

31

Linda and Bennie Budiman

Ayub and Bilquis Khatri

Jharna and Paras Chokshi

Khushnood and Fauziya Shokrekhuda

*Plaintiffs' Eight Amended Petition*   4

Iqbal and Khatoon Lakhani

Sam and Angela Chan

Ehab and Nargis Ashoor

Nizar and Zulekha Ali

Son and Phuong Pham

Shamsuddin and Dohra Ali

Paul Choudhuri

John and Wanda Rushing

John and Nancy Phan

Doug and Nicole White

Jignesh and Niketa Amin

Hafiz and Amina Lakhani

Emily and Michael Agina

Rahim and Mehnaz Maknojia

Atkins and Louisa Lai

Deborah and Chuck Schmidt

Minhas and Farzana Vellani

Raju and Amee Patel

Shahnaz and Mohammad Khanani

Abbas and Mehnazi Ali

Bernabe and Elizabeth Tolosa

Joaquin and Maria de Lourdes Medina

Frederick and Brenda Hoyer

*Plaintiffs' Eight Amended Petition*    5

Alexander and Wen-Hsien Lin

Hong and Quan Tran

Victor and Claudia Pena

Yogesh Singal and Soni Gupta

14.    The following Plaintiffs purchased homes from David Weekly Homes (hereafter Weekly) and are presently under a Court Order compelling arbitration of their specific claims against David Weekly. These "Weekly Plaintiffs", as they will hereafter be called collectively, have claims against Academy, CHHOA, and Chelsea Harbour. These Plaintiffs each seek actual compensatory damages in the amount of Two Hundred Thousand ($200,000.00) per household. In addition, these Plaintiffs seek reasonable and necessary attorney's fees, exemplary damages, and all other relief requested below.

Terrance and Deborah Rolls

Asif and Shireen Karim                    *35*

Mohammed and Shahida Memon

Earnest and Angela Williamson

Anil and Sujata Nair

Karim and Mumdaz Momin

Manohar (Uma) and Maharani Medi

Ming and Yili Lai

Krishna and Kalyani Muppavarapu

Steve and Manette Tegethoff

Shirish and Prahaba Desai

Jonathan and Deimry (Dee) Grady

*Plaintiffs' Eight Amended Petition    6*

Mar 27 2007 10:28                    281-693-3737              p.9

Rex and Cecelia Slaten

Arun and Kalpana Singh

Donald and Charyl Russell

Amin and Zulekha Maredia

Marvelyn Humphrey

Khanh and Vivienne Nguyen

Sima Ajani and Amir Zulficar

Naushad and Narmin Kermally

Leslie and Alzaada Aikens

Mammazhiyil and Saramma Thomas

Gerald Mischon

Zhiguo Wang

Leelamma and MG Mathew

Mona Emmanuel

Nizar (Nick) and Dilshad Momin

Amir and Roya Rezvani

Mohammad and Dinaz Lokhandwalla

Shafeeq and Rubina Khimani

Marsha Hart and Jonathan Mehta

Vijay and Sweety Patel

Nadir and Surraiyd Waliyani

Seema Aggarwal

Daniel & Tracee Turner

*Plaintiffs' Eight Amended Petition*   7

15.     For the purposes of this petition, all Weekly Plaintiffs have causes of action against only Academy, Chelsea Harbour, and the CHHOA as more fully explained below.   Plaintiffs who bought homes from Princeton have causes of action against Academy, Chelsea Harbour, Legend, Princeton, and the CHHOA as more fully explained below.

## V. FACTS

### (A)   Development, Construction, Marketing, and Sale

16.     The Chelsea Harbour subdivision is located in Fort Bend County, Texas. In connection with the development of the Chelsea Harbour subdivision, Chelsea Harbour, acting through Academy, developed the subdivision as a lake-front community. The Lakes were the focal point of the development and the site was laid out to maximize the aesthetic value of the Lake-front lots.   Nearly all of the homes were constructed on the lots connected to these lakes.   The subdivision was marketed, advertised, and presented to the public as "lake-front" properties with an emphasis of the beauty and esthetic value of the Lakes.   Moreover, one of the Lakes is located near the entrance to Chelsea Harbour so that the public's first view of the subdivision is a beautiful Lake.

17.     Legend, Princeton, and Weekly constructed the homes that Plaintiffs' purchased.   At all times during the building and selling process, Weekly, Legend, and Princeton marketed and advertised their respective homes for sale as "water-front estates" or "Lake-front estates."   The marketing and advertising was done for the purpose of inducing buyers such as the Plaintiffs to purchase homes in the Chelsea Harbour Subdivision.   Plaintiffs visited the subdivision and were attracted to the then beautiful lakes and homes.

*Plaintiffs' Eight Amended Petition*   8

18.    During the same time period that Weekly, Princeton and Legend were advertising, marketing, and selling their homes using the inducement of "Lake-front property," Academy, Legend, and Princeton were fully aware of existing defects and problems concerning the Lakes. Upon information and belief, Weekly was not aware of the nature and severity of the problems with the Lakes because Defendants had also failed to disclose these problems to Weekly.

### (B)  Failure to Disclosure

19.    At the time that Defendants sold homes to the public, Defendants knew that the Lakes were failing. In particular, Defendants knew that the walls of the Lakes were breaking apart and that water was leaking from the Lakes into the adjacent properties upon which Plaintiffs' homes were located. Previously in 2002, Defendants Academy and Chelsea Harbour had filed a lawsuit in Harris County against the engineers and companies who constructed the original Lakes.

20.    The lawsuit styled CHELSEA HARBOUR, LTD, FORT BEND COUNTY MUNICIPAL UTILITY DISTRICT NO. 25, AND ACADEMY DEVELOPMENT, INC. VS. PATE ENGINEERS, INC., COLT UTILITIES, INC., LONNIE LISCHKA COMPANY, INC., TRAVELERS CASUALTY, SURETY COMPANY OF AMERICA, AND THE MURILLO COMPANY was filed in the 80th District Court of Harris County, Texas under Cause Number 2002-63616. In the lawsuit and subsequent pleadings, Defendants alleged that "The Lakes leak and the wall is breaking apart" and that the detention pond was not properly graded. Moreover, Defendants alleged that the Lakes were 1) not constructed in a good and workmanlike manner, 2) not constructed in accordance with proper construction practices, 3) not free

*Plaintiffs' Eight Amended Petition*   9