from defects, 4) not fit and proper for the uses intended, 5) negligently designed, developed, tested, inspected, and constructed, 6) negligently manufactured, distributed, or supplied materials in, on, or at the Lakes, 7) and built the Lakes using unsuitable and defective material. Academy and Chelsea Harbour also alleged breach of warranty and sought recovery of damages for diminution of value, costs of testing, and costs of repair.

21.     Prior to selling homes to Plaintiffs, Defendants knew the nature and extent of the specific problems with the Lakes from engineering reports, test results, and other information obtained by Defendants. In particular, Defendants' own experts informed Defendants that 1) the Lakes and wall were not properly designed and constructed, 2) the Lakes were losing substantially more water than they would lose if the Lakes had been properly designed and constructed, 3) the walls had excessive cracks and displacements, 4) water was escaping under and around the sloped paving, between the sloped paving and the wall, at the outfall structure, perhaps through the clay liner at greater depths, through cracks in the wall, and other similar problems.. Defendants also knew that the problems with the Lakes would get worse over time.

22.     Defendants further knew that that the cost of reconstructing the Lakes would be in the $2 to $3 million dollar range. In addition, Defendants knew that their own experts had concluded that the condition of the Lakes had substantially decreased the value of the Chelsea Harbour subdivision; specifically, a loss of value from approximately $6.5 million to $2.25 million dollars for a loss in diminution of value in the range of $3.75 to $4.5 million dollars. Defendants also represented, through their experts, that sales had fallen off and appeared likely to decrease dramatically. Upon information and belief, Defendants had additional information concerning problems with

*Plaintiffs' Eight Amended Petition* 10

the Lakes; however, such information was and continues to be within the exclusive control of Defendants.

23.    Defendants failed to adequately and properly disclose information concerning the Lakes to the Plaintiffs before Plaintiffs purchased their homes.   In addition, Defendants failed to disclose such information to Weekly; thereby preventing Weekly from in turn disclosing such information to the Weekly Plaintiffs.  If Plaintiffs had been properly made aware of the problems with the Lakes, Plaintiffs would not have purchased the homes, or alternatively, Plaintiffs would have requested a reduction in the purchase price of their homes.  Moreover, Chelsea Harbour's declarations, covenants and restrictions include a homeowner's right to quiet enjoyment.

### (C) Inadequate Disclosure and Misrepresentations/Deceptive Acts

24.    Prior to purchasing their Princeton home, one or more of the Plaintiffs were required to sign a disclosure statement (hereafter called Investigation Disclosure). However, the disclosure was inadequate and contained misrepresentations and statements that were misleading, deceptive, and false.   In particular, the disclosure informed Plaintiffs that potential lake issues were being "investigated."  However, the disclosure was prepared after the investigation was substantially complete and the scope of the proposed repairs were already known to Defendants through their own investigation and experts hired in the Harris County lawsuit.  As such, the Investigating Disclosure did not meet standard disclosure requirements, was inadequate, and as such was merely an attempt to mislead potential buyers such as the Plaintiffs.

25.    Some of the Plaintiffs, when making their real estate purchase, asked direct questions to either Princeton, Legend, or Weekly about the Lakes.   With the

*Plaintiffs' Eight Amended Petition* 11

exception of the inadequate and misleading "Investigation Disclosure" above, the Plaintiffs did not receive adequate information that would warn or otherwise notify them of the significant Lake problems.   Moreover, in response to questions about the Investigating Disclosure, Plaintiffs were assured that the disclosure only concerned minor repairs, routine matters, or maintenance issues. Finally, the title company used by one or more of the Plaintiffs were owned, operated, or controlled by Defendants.

26.     Plaintiffs will show that the problems with the Lakes have affected the value of their property and their homes.  Plaintiffs maintain a good faith belief that the condition of the Lakes has in the past, and continues, to cause damage to their residential properties.

### (D)  Post-Purchase Misrepresentations and Deceptive Acts and Statements

27.     Subsequent to Plaintiffs' purchases of their homes, Defendants made misrepresentations and false, misleading, and deceptive acts or statements to Plaintiffs concerning Defendants' knowledge of the condition and problems of the Lakes, the need and status of repairs, the nature and extent of the Lake problems, the purpose of the repairs, the nature of any guarantee or warranty, the status of any investigation, the length of repairs, Defendants' legal obligations, Plaintiffs' legal rights, and various other issues concerning the Lakes.   These statements were made by Defendants' agents and representatives in various letters, meetings, and other communications.

28.     The letters in question were mailed to Plaintiffs between February of 2004 and September of 2005.  The meetings took place between October 2004 and June 2005. At one or more of such meetings, attorneys for Defendants also made misrepresentations

and false, misleading, and deceptive statements to Plaintiffs regarding one or more of the issues discussed above.

29.     Upon information and belief, Defendants attempted to conceal the existence of the Harris County lawsuit and further conspired to hide the nature and extent of the problems with the Lakes. When the CHHOA was subsequently contacted by some of the Plaintiffs, the CHHOA failed and refused to provide information requested concerning the lawsuit and the condition or problems with the Lakes. Moreover, the CCHOA provided false, misleading, and deceptive information in an effort to dissuade Plaintiffs from making any further inquires into the problems with the Lakes. The CCHOA was controlled by the Defendants and was used as a buffer to attempt to deflect Plaintiffs' inquires and concerns about the Lakes

### (E)   Inadequate Lake Repairs

30.     Documents obtained by Plaintiffs indicate that Academy and Chelsea Harbour received at least $2 million dollars in settlement proceeds from the Harris County lawsuit. These funds were ostensibly intended to be used by Defendants to make repairs to the Lakes. In the Academy lawsuit, Defendants' own experts had detailed the problems with the Lakes and the necessary repairs and estimated costs of repair. However, to the extent that such proposed Lake repairs where adequate, Defendants failed to follow their own experts' advice and attempted to repair the Lakes without the necessary and proper plans and specifications. Upon information and belief, these attempted repairs were inadequate and did not meet acceptable industry and engineering standards. Upon information and belief, these repairs will fail over time and the Lakes

Mar 27 2007 10:29                                281-b93-3737                      p.16

will experience excessive water loss. Additional Lake repairs will be required to ensure the integrity of the Lakes.

31.     Subsequent to the alleged repairs, Defendants, who refused to guarantee or warranty the Lake repairs, engaged the community in a series of meetings and written communications designed to diffuse the growing concerns raised by the Plaintiffs. In these meetings and communications, Defendants made misrepresentations and false, misleading, and deceptive statements and acts that were designed to dissuade Chelsea Harbour residents from investigating the adequacy of the Lake repairs. Some residents, however, investigated the Lake issues on their own and discovered the Harris County lawsuit and other pertinent information that had been withheld from Plaintiffs at the time they purchased their homes.

32.     Upon information and belief, continuous and excessive water leakage from the Lakes that flow laterally and under the Plaintiffs' homes and properties may cause structural damage to Plaintiffs' homes and foundations. Over time, this will cause Plaintiffs to incur excessive repair costs to the foundations and structures of their homes.

33.     In the Harris County lawsuit, Defendants made claims and provided expert opinions that they would suffer substantial diminution in value as a result of problems with the Lakes. Chelsea Harbour and Academy asserted that they had "...suffered damage including, but not limited to, the *diminution of value of their property...*" (Emphasis added). Similarly, Plaintiffs contend in this lawsuit that the failure of the Lakes directly affects the value of the homes in the community. Plaintiffs will demonstrate that the impact of the failed Lakes, the extended construction process, and the necessity and cost of future repairs will have a negative impact on the home values in

*Plaintiffs' Eight Amended Petition* 14

Mar 27 2007 10:29                                    281-693-3737                    p.17

the Chelsea Harbour subdivision.  Plaintiffs will also be required to disclose these Lake

issues to future buyers which will further reduce the market values of Plaintiffs' homes.

As such, Plaintiffs' homes and properties have suffered diminution of value due to the

past, present and future condition of the Lakes.

34.    Whether or not the Lakes are still leaking, Plaintiffs will demonstrate that

the Lakes, in their present condition, lose more water and will cost more to maintain than

similar lakes of similar design.  The Lake water is now raising the surrounding ground

water levels to the point that Lake water is escaping from multiple driveways, sidewalks

and yards.  Plaintiffs will further show that the ground water level is too close to the

foundations of the homes and is now and in the future going to affect the foundations and

structural integrity of Plaintiffs' homes.  Plaintiffs' homes are experiencing an

unreasonable amount of drywall cracks, joint separations in trim and windows, tiles

breaking, mortar cracks, and windows cracking without impact.  As a result, the Chelsea

Harbour subdivision has a negative "stigma" attached to the community.

## VI.  JOINT ENTERPRISE/CIVIL CONSPIRACY

35.    Plaintiffs will show that the Defendants were in the past and are now

inextricably intertwined.  One or more of the Defendants have the same owners, officers,

directors, registered agents, addresses, and other connections that make it difficult for

Plaintiffs to pinpoint which Defendant is responsible for each misrepresentation or false,

misleading, or deceptive act or statement.

36.    Plaintiffs will show that Defendants Academy, Chelsea Harbour,

Princeton, Legend, and CHHOA were engaged in a joint enterprise in that Defendants

had (1) an agreement, either express or implied, with respect to the enterprise or

endeavor; (2) a common purpose; (3) a common business or pecuniary interest; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

37.    Plaintiffs will further show that Defendants Academy, Chelsea Harbour, Princeton, Legend, and CHHOA were engaged in a civil conspiracy in that Defendants had common knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Plaintiffs. In particular, Defendants conspired to withhold information from Plaintiffs that should have been disclosed prior to Plaintiffs' purchase of their homes and subsequently mislead Plaintiffs regarding the condition of the Lakes. At various times, one or more of the Defendants performed some act or acts to further the conspiracy.

38.    Plaintiffs will show that one or more of these Defendants were engaged in a joint enterprise that conspired to hide and withhold relevant and material information, about the Lakes, prior to Plaintiffs' purchases of homes in the Chelsea Harbour subdivision. Subsequently, these Defendants conspired to hide and withhold relevant and material information regarding the repairs and condition of the Lakes.

### VII.  CAUSES OF ACTION

#### (A)    Statutory Fraud in Real Estate

39.    Defendants failed to disclose material and relevant facts, and further, made false representations of material facts with actual awareness and knowledge of 1) their falsity for the purpose of inducing Plaintiffs' to enter into the contracts for the sale of Real Property and (2) with the intent to dissuade Plaintiffs from investigating and presenting claims for damages that Defendants' conduct caused. One or more of the

Plaintiffs relied on the promises, representations, and omissions (inadequate disclosure) to their detriment in entering into the earnest money contracts (and related closing documents) for the purchase and sale of residential homes in Chelsea Harbour. Plaintiffs also relied on the representations made in response to their specific inquiries at public meetings and in written communications from Defendants.

40.     Plaintiffs   will   show   that   Defendants   also   made   material misrepresentations, the misrepresentations were made with knowledge of their falsity or made recklessly without any knowledge of the truth and as a positive assertion, the misrepresentations were made with the intention that they should be acted on by the Plaintiffs, and Plaintiffs relied on the misrepresentations and thereby suffered injury. These misrepresentations include Defendants failure to disclose the problems, and extent of problems, with the Lakes inn Chelsea Harbour prior to Plaintiffs' purchase of homes in Chelsea Harbour. The element of misrepresentation can be demonstrated by way of concealment by silence.   Silence is equivalent to a false representation where circumstances impose a duty to speak and one deliberately remains silent.

41.     The misrepresentations also included false statements of fact, or promises of future performance made with an intent, at the time the promise was made, not to perform as promised, or a statement of opinion based on false statements of fact, or a statement of opinion that the Defendants knew to be false, or an expression of opinion that was false, made by Defendants claiming or implying to have special knowledge of the subject matter of the opinion.  Special knowledge means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.   Defendants further advertised and promoted the Chelsea Harbour

*Plaintiffs' Eight Amended Petition* 17

subdivision as "water-front" or "lake-front" properties, including advertising, billboards, website, other examples (Windermere Lakes), artists' renderings, and other promotional material.

42.     Defendants failed to disclose material facts within the knowledge of Defendants.  Defendants knew that the Plaintiffs were ignorant of the facts and did not have an equal opportunity to discover these facts.  Defendants intended to induce the Plaintiffs to take some action by failing to disclose the facts, and Plaintiffs suffered injury as a result of acting without knowledge of the undisclosed facts as set forth above. Misrepresentations were also contained within the Investigative Disclosure signed by some Legend Plaintiffs.

43.     Plaintiffs will also show that Defendants used deception to secure the Plaintiffs signature on the Investigating Disclosure.  Defendants caused Plaintiffs to sign a document affecting property and Defendants did so by deception with the intent to defraud or harm the Plaintiffs.  The deception in question occurred by creating or confirming by words or conduct a false impression of law or fact that was likely to affect the judgment of Plaintiffs in the transaction.

44.     One or more of the Plaintiffs sustained the following economic and actual damages as a result of the actions, misrepresentations and/or omissions of Defendants::

(a)     Out-of-pocket expenses for home maintenance and repairs, expert witness fees, costs of copies for depositions and Costs of Court.

(b)     Reasonable and necessary engineering or consulting fees.

(c)     Diminished or reduced market value of their properties.

45.     Pursuant to Texas Business & Commerce Code Section 27.01(b), Plaintiffs request that they be awarded a judgment from and against Defendants for all

*Plaintiffs' Eight Amended Petition* 18

actual damages suffered as a result of Defendants omissions and misrepresentations. Furthermore, Defendants' omissions and false representations were made with actual awareness of their falsity, and therefore, pursuant to Texas Business & Commerce Code Sections 27.01 (c) and (e), Plaintiffs are entitled to recover exemplary damages and reasonable and necessary attorney's fees, expert witness fees, costs of copies for depositions and costs of Court.

### (B)   Negligence and Negligent Misrepresentation

46.      Defendants owed Plaintiffs multiple duties of care regarding the disclosure of relevant facts, construction of the Lakes, and the protection of Plaintiffs' property interests, including but not limited to the repair work performed on the Lakes. Defendants owed Plaintiffs duties of care related to the disclosure of information relating to the condition of the premises that they were selling (including the Lakes), the potential for water intrusion onto the premises and into the improvements, the condition of the common areas and the long-term costs and effect of the Lakes on the community that they were marketing to the public. Defendants owed a duty of care to all Plaintiffs not to misrepresent facts that they knew or should have known to be false that would be reasonably relied upon by Plaintiffs. This duty extends to the Weekly Plaintiffs who were not told about the Lake problems prior to purchasing their homes and/or who received written communications or were present in public meetings where Defendants made negligent misrepresentations. Defendants were also negligent in the hiring and supervision of the entities that both constructed and repaired the Lakes.

47.      Plaintiffs would show that all Defendants breached the above described duties and that such acts and/or omissions constitute the proximate cause of Plaintiffs'

damages, including cost of repair and dimunition of value to their homes.

### (C) DTPA

48.     Plaintiffs would show that Defendants engaged in certain false, misleading and deceptive acts, practices and/or omissions actionable under the Texas Deceptive Trade Practices - Consumer Protection Act (Texas Business and Commerce Code, Chapter 17.41, et seq.). Plaintiffs qualify as consumers under the statute because they all sought or acquired goods and/or services from the Defendants.

49.     Defendants further engaged in an "unconscionable action or course of action" to the detriment of Plaintiffs as that term is defined by Section 17.45(5) of the Texas Business and Commerce Code, by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree. In particular, Defendants withheld information about the condition of the Lakes that should have been disclosed to Plaintiffs. Defendants also provided misleading disclosures and information to the Plaintiffs in an attempt to conceal the extent of the problems with the Lakes.

50.     Violations of Section 17.46(b).   CHHOA, Academy, Princeton and Legend violated Section 17.46(b) of the Texas Business and Commerce Code, in that Defendant:

1)      Representing that *goods or services* had or would have *characteristics* that they did not have [*or*]

2)      Representing that *goods or services* are or will be of a particular *quality* if they were of another [*or*]

3)      Representing that an agreement confers or involves *rights* that it did not have or involve [*or*]

4)      Failing to disclose information about *goods or services* that was known at the time of the transaction with the intention to induce *Plaintiffs* into a

*Plaintiffs' Eight Amended Petition* 20

transaction *he* otherwise would not have entered into if the information had been disclosed [*or*]

5)     advertising goods or services with intent not to sell them as advertised;

6)     representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law

51.     Plaintiffs would show that the acts, practices and/or omissions complained of were the producing cause of Plaintiffs' damages as described below.  Plaintiffs would further show the acts, practices and/or omissions complained of under Section 17.46(b) of the Texas Business and Commerce Code were relied upon by Plaintiffs to Plaintiffs' detriment.

52. Plaintiffs     would also show that Defendants failed to construct and/or repair the Lakes in a good and workmanlike manner and that Defendants breached an express warranty and the implied warranties of performance in a good and workmanlike manner and/or fitness for a particular purpose.

53.     Plaintiffs would show that the false, misleading and deceptive acts, practices and/or omissions complained of herein were committed "knowingly" in that Defendants had actual awareness of the falsity, deception, or unfairness of such acts, practices, and/or omissions.

54.     Plaintiffs further aver that such acts, practices, and/or omissions were committed "intentionally" in that these Defendants specifically intended that Plaintiffs act in detrimental reliance on the falsity or deception of the unfairness.

55.     One or more of the Plaintiffs sustained mental anguish and the following economic and actual damages as a result of the actions and/or omissions of these Defendants described hereinabove:

*Plaintiffs' Eight Amended Petition* 21

(a)        Loss of the "benefit of the bargain."

(b)        Diminished or reduced market value of the Plaintiffs' properties.

(c)        Costs of repairs necessary to address foundation and structural
           damages to Plaintiffs homes.

Plaintiffs are also entitled to recover additional damages and reasonable and necessary attorney's fees provided by Chapter 17 of the Texas Business and Commerce Code.

## VIII  EXEMPLARY DAMAGES

56.    Plaintiffs would further show that the acts and omissions of Defendants complained of herein were committed knowingly, willfully, intentionally, with actual awareness, and with the specific and predetermined intention of enriching said Defendants at the expense of Plaintiffs.  In order to punish said Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiffs also seeks recovery from Defendants for exemplary damages as provided by Section 41.003(1) of the Texas Civil Practice and Remedies Code and by Section 27.01 of the Texas Business and Commerce Code

57.    By clear and convincing evidence, Plaintiffs will further show that Defendants were malicious and that Defendants acts or omissions, when viewed objectively from the standpoint of Defendants at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

## IX. ATTORNEY'S FEES

*Plaintiffs' Eight Amended Petition* 22

58.    Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiffs herein, including all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just, as provided by (a) Section 17.50(d) of the Texas Business and Commerce Code; (b) Section 27.01(e) of the Texas Business and Commerce Code; and (c) Chapter 38 of the Texas Civil Practice and Remedies Code

## X.  CONDITIONS PRECEDENT

59.    All conditions precedent have been performed or have occurred as required by Texas Rule of Civil Procedure 54.

## XI.  DECLARATORY JUDGMENT AS TO CHHOA

60.    The Chelsea Harbour Homeowners Association (CHHOA) is controlled by Defendants. Defendants exercise of control over the CCHOA has existed since its inception and continuous to the present. CHHOA had a duty to act in the best interest of the homeowners in the Chelsea Harbour subdivision. Instead, the CHHOA was used by Defendants to control the flow of information and to dissuade and discourage Plaintiffs from investigating the condition of the Lakes. As such, the CHHOA breached its fiduciary duty to Plaintiffs and instead acted in the best interest of Defendants.

61.    The CHHOA participated with the other Defendants in the suppression of information and the dissemination of deceptive, false, and misleading information to Plaintiffs. The CHHOA failed to timely and fully disclose to Plaintiffs the problems with the Lakes, the cause of the leaks, the existence of the Harris County lawsuit, the settlement of the Harris County lawsuit, the cost of repair and future repairs to the Lakes, and other material and relevant facts known to the Defendants.

*Plaintiffs' Eight Amended Petition* 23

62.     Defendants have refused to give control of the CHHOA to the member homeowners.  Upon information and belief, vacancies and replacements on the board have been filled with Defendants' employees or agents.  As such, the Board of Directors of the CHHOA is in a fatal conflict with the interests of the homeowners in the Chelsea Harbour subdivision..  This conflict cannot be reconciled with the fiduciary duties owed by the CHHOA to the Plaintiffs as homeowners in the Chelsea Harbour subdivision.

63      The CHHOA has further failed to comply with and operate in accordance with its Articles of Incorporation, bylaws, and other legal requirements.  Moreover, the CHHOA has failed to maintain records as required by the Articles, bylaws, and Texas law. Plaintiffs therefore request that a declaratory judgment be entered under Chapter 37 of the Texas Civil Practice and Remedies Code dissolving the current board of the CHHOA and ordering elections limited to actual Homeowners of the Chelsea Harbour subdivision.  In addition, Plaintiffs seek recovery of reasonable and necessary attorney's fees and costs.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully pray that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants, jointly and severally, for their general and specific damages, economic and non-economic damages, actual damages, additional damages, and exemplary damages in an amount in excess of the minimum jurisdictional limits of the Court, together with prejudgment and post judgment interest at the maximum rate allowed by law, attorney's fees, costs of court, and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

*Plaintiffs' Eight Amended Petition* 24

Respectfully Submitted:

_____

Ryan B. Bormaster
**D. MILLER & ASSOCIATES, PLLC**
Texas Bar No. 24026138
11211 Katy Freeway, Suite 540
Houston, TX 77079
Tel: (713) 779-3476
Fax: (713) 467-0306
Email: rbormaster@dmillerlaw.com

_____

Keith S. Donati
Texas Bar No.: 05973100
**KOCHMAN, DONATI & CHARBONNET,
L.L.P**
12012 Wickchester, Suite 310
Houston, TX 77079
Tel: (713) 871-2490
Fax: (713) 871-2495
Email: ksdonati@kdclaw.com

_____

Frode Willumsen
**WILLUMSEN LAW FIRM, P.C.**
1330 Post Oak Blvd., Suite 1600
Houston, Texas 77056
Tel: (713) 963-4646
Fax: (713) 963-4664
Email: wlawfirm@aol.com

ATTORNEYS FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I certify that a copy of this document was forwarded by facsimile transmission/hand-delivery/certified mail, return receipt requested to all parties entitled to notice on March 27, 2007.

_____

Frode Willumsen

*Plaintiffs' Eight Amended Petition 25*

# Exhibit B

CAUSE NO. 05-CV-142846

| | | |
|---|---|---|
| LINDA BUDIMAN, MOHAMMED MEMMON, EARNEST WILLIAMSON, AMIN MAREDIA, EHAB ASHOOR, MING LAI, NIZRA ALI, STEVE TEGTHOFF, SHIRISH DESAI, JONATHAN GRADY, REX SLATEN, ARN SINGH, DANIEL TURNER, MARVELYN HUMPHREY, ABASS ALI | § § § § § § § § § § | IN THE DISTRICT COURT OF |
| VS. | § § | FORT BEND COUNTY, TEXAS |
| ACADEMY DEVELOPMENT, INC. CHELSEA HARBOUR, LTD., and CHELSEA HARBOUR HOMEOWNER'S ASSOCIATION, INC. | § § § § § | 268TH JUDICIAL DISTRICT COURT |

**DEFENDANTS' FIRST AMENDED ANSWER, COUNTERCLAIM, AND
MOTION FOR SANCTIONS**

Defendants Academy Development, Inc., Chelsea Harbour, Ltd., and Chelsea Harbour Homeowner's Association, Inc. file their First Amended Answer, Counterclaim, and Motion for Sanctions and respectfully show the Court the following:

I.
**GENERAL DENIAL**

Defendants generally deny the allegations in Plaintiffs' pleadings and demand strict proof thereof as required by law.

II.
**COUNTERCLAIM AND MOTION FOR SANCTIONS**

Defendants/Counter-Plaintiffs, Academy Development, Inc., Chelsea Harbour, Ltd., and Chelsea Harbour Homeowner's Association, Inc. (collectively referred to as "Academy"), complain of Plaintiffs/Counter-Defendants, Linda Budiman, Mohammed Memmon, Earnest Williamson, Amin Maredia, Ehab Ashoor, Ming Lai, Nizra Ali, Steve

Tegthoff, Shirish Desai, Jonathan Grady, Rex Slaten, Arn Singh, Daniel Turner, Marvelyn Humphrey, and Abass Ali.  Academy also seeks sanctions against these 15 Plaintiffs and their counsel for obtaining an *ex parte* temporary restraining order when they knew the undersigned lawyer, Rusty Hardin, represented Academy.

A.     Overview

     Academy is a land developer.  In mid-2000, Academy began developing a residential lake-front community in Fort Bend County called Chelsea Harbour.  Plaintiffs are residents of Chelsea Harbour who are complaining about Academy's efforts to make repairs to two lakes in the community.

     In the summer of 2001, Academy began to suspect the lakes were not properly maintaining water.  Relying on the engineers and contractors who designed and built the lake, Academy sought to determine the cause, if any, of the problem.  After unsuccessful attempts to determine the extent and cause of the problem, on December 17, 2002, Academy sued the design engineer and construction contractors.  Suit was filed in Harris County because Academy and the defendants were located in Harris County.

     On August 30, 2004, mediation was conducted, and a confidential settlement was reached.  After Academy received the settlement proceeds a few weeks later, Academy began using the proceeds to repair the lakes using a new contractor.

     Plaintiffs were not parties to the previous lawsuit against the design engineer and the construction contractors, and they were not parties to any of the contracts regarding the design and construction of the lake.

     After the underlying lawsuit was settled and while the lakes were being repaired, Academy hosted three meetings with  Plaintiffs to explain what was being done to repair the lakes and when the repairs should be complete.  During this time period, it became

increasingly clear that the lawyers who ultimately filed suit against Academy were actively soliciting residents to sue Academy.

On May 23, 2005, Plaintiffs filed suit and obtained an *ex parte* temporary restraining order that abruptly stopped the lake repairs. The application for the temporary restraining order contained many factually misleading statements (which were presumably also conveyed orally to the magistrate who heard the matter), and Plaintiffs' counsel failed to inform the magistrate that Rusty Hardin was Academy's legal counsel in this case. As required by the Court, Plaintiffs posted a cash bond in the amount of $10,000.00. *See* Exhibit "A."

On May 24, 2005, the Court modified the temporary restraining order to allow construction activities to resume.

For the reasons set forth below, Academy seeks damages for wrongful injunction and malicious prosecution. Academy also seeks recovery of its attorneys' fees because it seeks declaratory judgments that:

1.    Plaintiffs have no standing to complain how Academy spends the settlement proceeds from a previous lawsuit in which Plaintiffs were not parties;

2.    Plaintiffs are not third-party beneficiaries to the settlement proceeds from the previous lawsuit;

3.    Academy does not owe Plaintiffs an accounting of the settlement proceeds from the previous lawsuit;

4.    Academy cannot "convert" its own settlement proceeds from a previous lawsuit;

5.    There is no cause of action in Texas for "wrongful preclusion from a homeowner's association;"

3

6.    There is no cause of action in Texas for "a developer's failure to keep homeowner's informed about construction projects in the community;" and,

7.    Plaintiffs have no standing to seek a declaratory judgment that the Chelsea Harbor Homeowner's Association should be dissolved and elections should be held because Plaintiffs are minority members of the Chelsea Harbor Homeowner's Association, and they do not control the homeowner's association.

Academy also seeks sanctions because Plaintiffs and their counsel knew the undersigned lawyer, Rusty Hardin, represented Academy, yet they sought and obtained an *ex parte* temporary restraining order in violation of the Texas Rules of Civil Procedure and the Fort Bend County Local Rules.

**B.**   **Factual Background**

    **1.**    **The litigation that prompted the lake repairs**

Academy prides itself on building premier lake-front communities in the Houston area. Academy developed Chelsea Harbour, a residential lake-front community in Fort Bend County, Texas. During the development of Chelsea Harbour, Academy contracted with Pate Engineers, Inc. (the engineers of the local municipal utility district, or "MUD") to design two lakes that were to be built in the subdivision. Academy also contracted with Lonnie Lischka Company, Inc. and Colt Utilities, Inc. to construct the lakes in accordance with the plans and designs prepared by Pate Engineers. The project required public bidding because it was built within the MUD, and Academy was required to select a contractor from the public bidding process.

In mid-2001 (after Academy had already finished building the lakes in Chelsea Harbour), Academy noticed that the lakes did not appear to be maintaining proper water levels.

Academy inquired about the drop in water levels and was assured by the lakes' design engineer that the water loss was not abnormal. Specifically, Academy was told that water levels could be dropping due to several reasons, including natural rates of evaporation, "settlement" of the lake, and weather and temperature conditions. However, Academy continued to monitor the lakes and continued to observe dropping water levels. Therefore, Academy asked the design engineers and contractors to investigate whether there was a problem. Despite numerous meetings and letters prompting action, Academy was unable to resolve the problem with the dropping water levels. Accordingly, Academy eventually was forced to sue the design engineer and contractors – hence the "underlying lawsuit."

Once the litigation began, the parties in the underlying lawsuit hired numerous experts to determine the cause of the water loss. All had their own theories about the cause and the potential remedies – but none were certain. It soon became clear that until the lake was actually drained, there was no way to determine the underlying cause of the suspected leak. Therefore, Academy and its engineering experts decided to lower the lake levels in order to ascertain the cause of the water loss.

On February 28, 2004, Academy sent a letter to all Chelsea homeowners explaining that its independent engineers would need to lower water levels to determine the cause of a suspected water loss. A copy of that letter is attached hereto as Exhibit "B."

The underlying litigation proceeded toward trial, with each defendant contending that there was no problem with the lakes or, in the alternative, if there was a problem, it was someone else's fault. Shortly before trial, the parties were ordered to mediation. Though Academy suspected that the cost to repair the lake would be in excess of the amount offered at mediation, Academy decided to settle in order to avoid the uncertainty and delay that would inevitably occur as a result of a trial on the merits and possible appeal. In short, Academy agreed to settle the underlying case for an amount

less than the anticipated cost of repairs so that it could begin to repair the lakes immediately. Academy did this knowing that it would likely have to pay for a significant amount of the repairs "out of its own pocket."

Plaintiffs were not parties to the underlying lawsuit, nor were they parties to any of the contracts with the design engineers or contractors that built the lakes.

## 2.   Academy hires Addicks to perform the lake repairs

Almost immediately after the parties settled the underlying lawsuit, Academy began the process of repairing the lakes. Academy hired Addicks Services, Inc. (hereinafter "Addicks") to perform the repairs, despite the fact that its bid was significantly higher than the other bids it received. Since the repairs did not fall within the MUD's original building guidelines, Academy was free to choose a contractor to perform the repairs. Academy hired Addicks, despite its high bid, because Addicks had vast experience in building lakes and because Addicks had built several lakes for Academy (and for other developers), none of which have had any problems. Academy also hired an independent engineering firm, Civil Tech, to oversee and monitor Addicks' repair work. Furthermore, Academy hired Geotech, a soils testing and engineering firm, to routinely test the new clay liner to ensure that it would properly hold water. Like Addicks, neither Civil Tech nor Geotech were involved in the original design or construction of the lakes.

After Addicks began making repairs in the fall of 2004, the cause of the leak quickly became apparent. Despite plans and specifications calling for a clay liner, Addicks discovered that the lake had not been properly lined with clay. Had the original contractors installed the clay as originally specified, the lake would not have leaked. Therefore, Addicks began the tedious job of replacing the clay liner.

To perform the work in a manner that is most effective (and least intrusive to the homeowners), Addicks is doing the work in sections, draining one part of the lake at a time in order to fix the liner. Contrary to Plaintiffs' false assertions, neither Academy

nor Addicks has been trespassing on the homeowners' property because Academy has a developer's easement that allows it to access the lakes to make the necessary repairs. A copy of the letter sent to the homeowners dated February 21, 2005 regarding the easement is attached as Exhibit "C."

In April, 2005, the repairs to the back lake were completed. The lake has been filled and is successfully maintaining water levels. Repairs to the front lake are now underway. Academy believes that once the repairs to the front lake are complete, both lakes will function exactly as originally intended.

3.   **Academy's continued communication with the Chelsea homeowners**

Contrary to  Plaintiffs' assertions, Academy communicated with the Chelsea homeowners throughout the lake repair process. For example, on October 14, 2004, Academy representatives held a homeowners' meeting to specifically discuss the lake repairs. (*See* Exhibit "D," a copy of Academy's letter notifying the homeowners of the meeting dated September 29, 2004).  The meeting, which was held at the Chelsea Harbour clubhouse, lasted over two hours and was attended by approximately 50 homeowners.  During the meeting, Academy representatives not only explained the status and future process of the lake repair, but they also answered questions posed by the homeowners.

Because many of the homeowner concerns centered around the issue of whether they would be left to "foot the bill" for the repairs, on October 27, 2004, Academy sent a letter to *every* Chelsea Harbour resident assuring them that "Academy will pay for the repairs on the lake so that it is fixed to acceptable engineering standards prior to turning it over to the homeowners association." A copy of the letter is attached hereto as Exhibit "E". Academy has always assured the homeowners that it will do whatever is necessary to fix the lake and that the homeowners will not be responsible for the cost of repairs.  In light of these assurances, it is unfathomable that Plaintiffs

7

went to court and sought an ex parte TRO because they "feared" that Academy will spend the settlement proceeds and cease the lake repairs.

After the October 2004 homeowners meeting, Academy sent yet another letter to the homeowners updating them on the progress of the lake repairs. In the letter, sent on December 17, 2004, Academy explained that an extraordinarily wet fall had slowed the contractor's ability to perform the necessary repairs. The letter also thanked the homeowners for their patience. A copy of this letter is attached hereto as Exhibit "F." It was around this same time that Academy learned that Tim Clyne from one the law firms currently representing the Plaintiffs began to solicit business in the Chelsea Harbour neighborhood.

In February, 2005, a Chelsea resident forwarded a flyer from the law firm, D. Miller & Associates about a meeting regarding an "investigation of events." A copy of this advertisement is attached as Exhibit "G." The meeting was to be held at the Chelsea Harbour clubhouse on February 13, 2004. Tim Clyne conducted the meeting. Ms. Lauren Darby, in-house counsel for Academy, also attended the meeting.

During the meeting, Ms. Darby again answered questions regarding the underlying lawsuit and the lake repairs. Mr. Clyne, however, acrimoniously asked Ms. Darby to provide him with specific confidential information from the underlying lawsuit and settlement. When Ms. Darby reminded Mr. Clyne that she could not legally divulge the terms of the confidential settlement, Mr. Clyne used Ms. Darby's statement, which was simply a true statement, as an opportunity to begin "grandstanding" in front of his potential clients by saying that was exactly why they needed his legal services.

On February 23, 2005, Mr. Clyne sent Ms. Darby a letter demanding documents and explanations for several matters related to the lake repair. A true and correct copy of this letter is attached hereto as Exhibit "H." However, after the tone and apparent purpose of Mr. Clyne's February 13th meeting, Academy refused to respond to Mr. Clyne's attempt to gather information for a lawsuit against Academy.

Instead, Ms. Darby arranged yet another informational meeting for interested homeowners, and she invited representatives from Addicks, Civil Tech, and GeoTech to attend so they could answer the homeowners' questions regarding the lake repairs. A copy of the letter dated February 18, 2005 notifying the homeowners of the meeting is attached as Exhibit "I."

On March 9, 2005, this next meeting was held. Representatives of the contractors and engineers spoke and explained how the repairs were being performed, why they were being done in the way they were being done, and the time frame for completion. Additionally, counsel from the undersigned firm, Rusty Hardin, was also present to explain non-confidential issues regarding the settlement of the underlying lawsuit. It was clear—throughout this meeting—that Mr. Hardin was, and is, Academy's lawyer. Moreover, in response to Mr. Clyne's attempts to engage Mr. Hardin in legal arguments in front of his potential clients, Mr. Hardin explained that he would argue legal issues with Mr. Clyne—if necessary—at the courthouse should Mr. Clyne decide to file a lawsuit. Mr. Hardin also warned Mr. Clyne that the meeting's purpose was to discuss the lake repairs. In addition to Mr. Clyne's presence, Mr. Edward Smith, D. Miller & Associate's in-house construction expert, was present and asked several questions. The two-hour meeting concluded with Academy's promise to update the homeowners and meet again before the next repair phase began.

After the March 9th meeting, Mr. Clyne's firm sent another flyer to all Chelsea residents, this time soliciting a meeting to discuss "structural damage caused by the condition of the lake." A copy of the flyer is attached as Exhibit "J." Academy representatives were not invited and did not attend this meeting.

On April 8, 2005, Academy sent another letter to all Chelsea homeowners notifying them that the repairs to the back lake were complete and that repairs to the front lake would shortly begin. A copy of the letter is attached as Exhibit "K." The letter

9

also advised that Academy was hosting another homeowner informational meeting on May 11, 2005.

At the May 11th meeting, Academy again presented representatives from the contractors and engineers to explain the current status of the lake repairs, how the repairs were being performed, and that the repairs were being "double checked" by the observing engineer and soils engineer. In response to questions about lake "repair plans," Mr. A.J. Schubach (the Addicks' project manager) explained that there were not any specific drawings or repair plans, and that his firm was simply installing the clay liner as it should have been done according to the original plans and specifications. Additionally, Civil Tech's engineering representative, Mr. Daryll Kaderka, explained that Civil Tech was hired as an independent engineering firm to oversee the work Addicks was doing, and to make sure Addicks was doing the job correctly. Finally, Mr. Fred Ehteshami of Geotech also addressed concerns that were raised regarding foundations of the houses. Mr. Ehteshami explained that, in his professional opinion, any water that had seeped underground would not cause any damage to the homeowners' foundations. This time, Mr. Clyne was not present at the meeting, but Mr. Keith Donati of Kochman, Donati & Charbonnet (who has been represented to be Plaintiffs' "trial counsel"), along with Mr. Edward Smith were present. However, neither of them asked any questions.

Ms. Darby, Academy's corporate counsel, attended all of the aforementioned homeowner meetings and actually conducted most of them. Additionally, each meeting was attended by representatives of Plaintiffs' law firms. Furthermore, Mr. Rusty Hardin attended one of the meetings and made it clear to Mr. Clyne that he was Academy's lawyer.

Despite this, on May 23, 2005, Plaintiffs sought and obtained an *ex parte* TRO that stopped the repair work that most homeowners were anxious for Academy to complete. In addition, even though Plaintiffs had been informed as to the status of the

on-going lake repairs for months, Plaintiffs filed a sworn pleading stating that they would suffer "irreparable harm" if the lake repairs were not halted, and that they had not been advised as to the status of the lake repairs.

Interestingly, the TRO was sought and obtained the day before Plaintiffs' counsel intended to hold another "public meeting and client update."  A copy of the flyer announcing a meeting on May 24, 2005 is attached hereto as Exhibit "L."  Given the timing of these events, it seems as though Plaintiffs' counsel hoped to announce his "TRO "victory" to his potential clients on the evening of May 24, 2005.

   4.   __The homeowners' association__

   Plaintiffs' original lawsuit makes numerous salacious allegations about the Chelsea homeowners' association, such as the "Defendant's incestuous control of the HOA Board of Directors creates an inherent and fatal conflict of interest."  Apparently, Plaintiffs and their lawyers do not understand how homeowners' associations are created in new developments.

   As with all new developments in Houston, the homeowners association is initially controlled and funded by the developer until enough houses are sold to allow the homeowners to run it themselves.  Although each new homeowner pays homeowner dues and is a member of the homeowners' association, the developer must initially subsidize the association so that it can afford to provide the community with basic services, such as insurance, lawn care, and subdivision maintenance because there are not enough homeowners in the community paying dues.

   According to the Chelsea Harbour deed restrictions (which are given to every new homeowner when they buy a home), the developer (Academy) has nine votes for each unsold lot remaining in its inventory, and each homeowner has one vote.  When most of the lots are sold, voting control automatically moves from Academy to the homeowners.  By that point, the homeowners' dues will be sufficient to pay the expenses of the homeowners' association.  Without Academy's initial subsidy of the

homeowners' association (which is quite substantial), the homeowners' dues would be insufficient to run the community in the early stages.

Until Academy loses voting control through the normal course of selling homes in the community, Academy is legally entitled to make decisions on behalf of the association. Therefore, there is no "incestuous" relationship, as Plaintiffs allege—it is a legal relationship common to all developing communities.

As shown above, and as will be demonstrated in a temporary injunction hearing and during trial on the merits, Academy has committed to make repairs to the lake, irrespective of the how the confidential settlement amount compares to the actual cost of the repairs. Academy has also communicated to the homeowners about the status of the lake repairs. And, Academy has informed homeowners on numerous occasions, both in writing and verbally, that it will not turn over the lakes to the association until the lakes are fixed in accordance with acceptable engineering standards.

Because Plaintiffs have abused the legal system to obtain improper injunctive relief, Academy asserts the following causes of action:

## C.    Causes of Action

### 1.    Wrongful Injunction and Malicious Prosecution

Academy incorporates by reference the foregoing allegations.

Plaintiffs sought and obtained a temporary restraining order based on the following "sworn" statements in their Application for Temporary Restraining Order:

A.    "*Upon information and belief*, Plaintiffs *fear* that the ongoing repair work on the lake is not being completed in accordance with the applicable standard of care and/or in a manner that will not result in a full and complete repair." Plaintiffs' Application for Temporary Restraining Order at ¶ 12 (emphasis added). This sentence cannot

12

be a sworn statement of fact to support the issuance of a temporary restraining order because it is based "on information and belief" and without personal knowledge.

B.   "*Upon information and belief*, Plaintiffs *fear* that the lakes are being repaired to the substantially same condition they were in when they were first built, a condition that does not work and even resulted in litigation which apparently settled for $2,000,000.00." *Id.* (emphasis added). This sentence cannot be a sworn statement of fact to support the issuance of a temporary restraining order because it is based "on information and belief" and without personal knowledge.

C.   "*If* the Defendants are using the same methods to repair the lakes that they sued over and *if* the Defendants are using the same materials and the same quality of construction that was used when the lakes were originally constructed, the Plaintiffs *could* be irreparably harmed and have no adequate remedy at law." *Id.* (emphasis added). This sentence cannot be a sworn statement of fact to support the issuance of a temporary restraining order because it is based on a hypothetical set of facts of which there is no personal knowledge.

D.   "Plaintiffs *believe* that *there is a very real probability* that, as a direct and proximate cause of the negligence, fraud, breach of implied and express warranties, breach of contract, breach of fiduciary obligations and duties, misrepresentation, wrongful preclusion from

13

the homeowner's association, conversion, mismanagement of settlement proceeds for which they are constructive third party beneficiaries, violations of the DTPA and other actions and inactions of Defendants, the Plaintiffs herein *may* have already suffered damages for which they *may* never be able to be made whole." *Id.* (emphasis added).  This sentence cannot be a sworn statement of fact to support the issuance of a temporary restraining order because it is not based on personal knowledge.

Despite a lack of "sworn" factual evidence, Plaintiffs made the following representations to the Court:

A.  "Unless [Defendants] and all of the persons or entities who are presently contracted to perform repairs on the lakes are immediately enjoined and restrained from the conduct described above, Plaintiffs *will* suffer irreparable harm for which there will remain no adequate remedy at law." *Id.* at ¶ 14 (emphasis added). This statement contradicts Plaintiffs' previous sworn statement that they "might" have irreparable harm by now claiming they "will" have irreparable harm if a restraining order is not issued.  Furthermore, it is clear that Plaintiffs' remedy, based on their alleged grievances, is money damages.  If Plaintiffs believe their property values have been diminished because of Academy's negligence, they can sue for damages.  There was absolutely nothing unique about this lawsuit that justified Plaintiffs' decision to seek a restraining order.

14

B.    "Unless this Honorable Court immediately restrains the Defendants from spending any of the Settlement Proceeds from the First Suit, from continuing with the current repairs to the lakes, from trespassing on Plaintiffs [sic] property to attempt repairs to Plaintiffs' residences without their knowledge and consent and from taking any further actions in the name of the Homeowner's Association, the Plaintiffs _will_ suffer immediate and irreparable injury, for which there is not adequate remedy at law." *Id.* at ¶ 20 (emphasis added).   This allegation, which was submitted to the Court as a sworn statement, is merely speculation.

C.    "The harm to Plaintiffs is imminent because the continued and _potentially reckless_ repairs are being effectuated this very moment and Plaintiffs have been provided no plans or other information relating to the repair process." *Id.* at ¶ 20(A) (emphasis added).   By making this allegation,  Plaintiffs equate "repair work that _could_ be faulty" with "imminent harm," which is a clear misrepresentation.

D.    Plaintiffs then equate "repair work that _could_ be faulty" with an "irreparable injury," which is a more blatant misrepresentation: "This imminent harm will cause Plaintiff [sic] _irreparable injury_ in that lakes are being worked on under a cloud of secrecy and the money that was accepted by Defendants in settlement is most probably being used for this purpose.   Once that money is gone there will be no proceeds with which to pay for new repairs or to

make the Plaintiffs whole as related to the diminution in property value that has already occurred and will continue to occur." *Id.* at ¶ 20(B) (emphasis added).

E.   Plaintiffs then claim, in the next paragraph, that "there is no adequate remedy at law" even though they admitted in the previous paragraph that their measure of damage was "diminution in property value," which is compensable with money damages. *Id.* at ¶ 20(C).  This is yet another misrepresentation.

F.   In a section entitled "ELEMENTS FOR INJUNCTIVE RELIEF," Plaintiffs make the following rambling statement concerning their likelihood of success on the merits, although it is difficult to find the recognized cause of action on which   Plaintiffs believe they will succeed:  "Plaintiffs are likely to succeed on the merits of its [sic] lawsuit because they can prove, by a preponderance of the evidence, that they were never informed that there was a legal action in which their subdivision and homes were the subject matter, that the Defendants kept secret their knowledge that Plaintiffs [sic] properties were being diminished in value due to the negligence of the parties named in the previous suit and because Plaintiffs are all homeowners who have suffered breaches of fiduciary obligations of the part of the officers of their homeowners' association and have since been wrongfully precluded from all participation in their homeowner's association." *Id.* at ¶ 19.

Academy will show that the injunctive relief that was obtained by Plaintiffs was wrongful in its inception because:

A.   Plaintiffs have no legal right to enjoin Academy's efforts to repair its own lake in the Chelsea Harbour subdivision;

B.   Plaintiffs' application did not contain sworn statements of fact that demonstrated "irreparable harm" or "likelihood of success on the merits;"

C.   Plaintiffs' application contained contradictory statements and misrepresentations;

D.   Plaintiffs have no standing to complain about the manner in which Academy is spending the settlement proceeds from a previous lawsuit in which Plaintiffs were not parties;

E.   Plaintiffs were not third-party beneficiaries to the settlement proceeds from the previous lawsuit;

F.   Academy does not owe Plaintiffs an accounting of the settlement proceeds from the previous lawsuit;

G.   Academy did not, and cannot, "convert" its own settlement proceeds from a previous lawsuit, as Plaintiffs alleged;

H.   There is no cause of action in Texas for "wrongful preclusion from a homeowner's association," as Plaintiffs allege;

I.   There is no cause of action in Texas for "a developer's failure to keep homeowner's informed about construction projects in the community," as Plaintiffs allege;

17

J.    Plaintiffs had no standing to seek a declaratory judgment that the Chelsea Harbor Homeowner's Association should be dissolved and elections should be held because  Plaintiffs were not members of the Chelsea Harbor Homeowner's Association, and because the developer of Chelsea Harbour had not transferred control of the homeowner's association to the residents of the community.

These actions also demonstrate that the original 15 Plaintiffs prosecuted their claims and sought a temporary restraining order maliciously and without probable cause, thereby entitling Academy to recover all actual damages caused by the temporary restraining order.

Academy will show that as a direct and proximate result of the wrongful issuance of the restraining order described above, Academy sustained financial losses in excess of the $10,000.00 cash bond that  Plaintiffs posted.  Therefore, recovery is sought on the cash bond and from the original 15 Plaintiffs individually for damages that exceed the cash bond.

2.    **Declaratory Judgments**

Academy incorporates by reference the allegations set forth above.

Pursuant to Chapter 37.001 *et seq.* of the Texas Civil Practice & Remedies Code, Academy seeks the following declarations from the Court:

A.    Plaintiffs have no standing to complain how Academy spends the settlement proceeds from a previous lawsuit in which Plaintiffs were not parties;

B.    Plaintiffs are not third-party beneficiaries to the settlement proceeds

18

from the previous lawsuit;

C.   Academy does not owe Plaintiffs an accounting of the settlement proceeds from the previous lawsuit;

D.   Academy did not, and cannot, "convert" its own settlement proceeds from a previous lawsuit;

E.   There is no cause of action in Texas for "wrongful preclusion from a homeowner's association;"

F.   There is no cause of action in Texas for "a developer's failure to keep homeowner's informed about construction projects in the community;" and

G.   Plaintiffs have no standing to seek a declaratory judgment that the Chelsea Harbor Homeowner's Association should be dissolved and elections should be held because Plaintiffs are minority members of the Chelsea Harbor Homeowner's Association.

A declaration from the Court is necessary to remove all uncertainties and insecurities with respect to:

A.   Academy's right to control the settlement proceeds they received in a previous lawsuit that did not involve Plaintiffs;

B.   Academy's right to control the Chelsea Harbour Homeowner's Association;

C.   The claims asserted by Plaintiffs in this litigation that are not recognized under Texas law; and

> D.    Academy's legal rights as the developers and home builders of the Chelsea Harbour subdivision.

## D.    **Motion for Sanctions**

At the meeting on March 9, 2005, Plaintiffs and their counsel spoke with Rusty Hardin who identified himself as Academy's lawyer.  Therefore, at that point, there was no question that Rusty Hardin was acting as Academy's lawyer in this case.  Despite this, on May 23, 2005, Plaintiffs and their counsel sought and obtained an *ex parte* temporary restraining order without notice to Mr. Hardin or his law firm.

Academy seeks sanctions because this conduct violates Rule 680 of the Texas Rules of Civil Procedure and Fort Bend County Local Rule 3.7.2. *See Howell v. Texas Workers' Compensation Commission*, 143 S.W.3d 413, 446-48 (Tex. App. – Austin, pet. denied) (sanctions imposed for obtaining *ex parte* temporary restraining order in violation of Tex. R. Civ. P. 680 and Cameron County local rule requiring notice to opposing counsel).

Rule 680 of Texas Rule of Civil Procedure states:

No temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon.

Rule 3.7.2 of the Fort Bend County Local Rules states:

All applications for ex parte relief shall state whether or not, within the knowledge of the applicant and his or her attorney, the opposing party is represented by counsel, and if so, the name of such counsel.

*See* Exhibit "M," Fort Bend County Local Rules.

The *Howell* case, which is cited above, involved the imposition of sanctions against parties who sought an *ex parte* TRO without notifying opposing counsel of the proceeding when the identity of opposing counsel was known. *Howell v. Texas Workers' Compensation Commission*, 143 S.W.3d 413, 446-48 (Tex. App. – Austin 2004, pet. denied). In *Howell*, the Austin Court of Appeals held that sanctions were appropriate. A copy of the opinion is attached as Exhibit "N."

In *Howell*, the court wrote:

> The [district] court imposed sanctions under its inherent authority based on violation of Cameron County local rule 1.3 because the respondents were aware of the identities of counsel for Texas Mutual before obtaining the TRO. *See* Cameron (Tex.) Civ. Dist. Ct. Loc. R. 1.3(B) (stating that counsel must certify in writing to court that "to the best of his knowledge the party against whom the relief is sought is not represented by counsel in the matter made the basis of the suit in which the relief is sought," that opposing party's counsel has been notified and does not wish to appear, or that counsel has "diligently attempted to notify such counsel and has been unable to do so"). The court further imposed sanctions under its inherent authority for violating rule of civil procedure 680, which states that "[n]o temporary restraining order shall be granted without notice to the adverse party" unless specific facts demonstrate that irreparable damage will result before notice and hearing.

*Id.* at 447.

The Austin Court of Appeals affirmed the trial court's decision to award sanctions because there was "some evidence [that] supports the district court's finding that obtaining an *ex parte* TRO constituted a bad-faith abuse of the judicial process." *Id.* at 447-48. In doing so, the court recognized a district court's "inherent authority to sanction parties for bad-faith abuses if it finds that to do so will 'aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity.'" *Id.* at 446-47 (*citing Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979)). The power to assess sanctions "exists only to the extent necessary to

deter, alleviate, and counteract bad-faith abuse of the judicial process." *Id.* at 447 (*citing Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App. – Houston [1st Dist.] 1995, no writ)).

Since Plaintiffs and their counsel engaged in the same conduct that justified sanctions in the *Howell* case, Academy respectfully asks the Court to assess sanctions against Plaintiffs and their counsel in an amount that will appropriately "deter, alleviate, and counteract [their] bad-faith abuse of the judicial process." *Id.* Academy respectfully submits that sanctions should consist of reasonable attorneys' fees and expenses, and all financial losses incurred by Academy as a result of the wrongful temporary restraining order that unnecessarily delayed the lake repairs.

## III.
## ATTORNEYS' FEES

Academy seeks recovery of their reasonable attorneys' fees incurred in this lawsuit pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.

## IV.
## JURY DEMAND

Academy has previously requested a trial by jury and tendered the requisite fee.

## V.
## PRAYER

WHEREFORE, Defendants and Counter-Plaintiffs Academy Development, Inc., Chelsea Harbour, Ltd., and Chelsea Harbour Homeowner's Association, Inc. pray that, upon final consideration, Plaintiffs take noting by their suit, and that they have and recover those actual damages described above, attorneys' fees, costs, prejudgment and post judgment interest as allowed by law, and such other relief to which they may be entitled.

22

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, P.C.

_____
Rusty Hardin
State Bar No.: 08972800
Bob Galatas
State Bar No.: 00787509
1401 McKinney, Suite 2250
Houston, Texas  77010
(713) 652-9000 Telephone
(713) 652-9800 Facsimile

ATTORNEYS FOR DEFENDANTS AND
COUNTER-PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing pleading was served on opposing counsel on July 22, 2005, pursuant to Rule 21a.

_____
Bob Galatas

23